**Don GILMORE and Sue Gilmore**

v.

**UNITED STATES.**

No. 374-58.

United States Court of Claims.

June 7, 1961.

Eli Freed, San Francisco, Cal., for plaintiffs.

Benjamin H. Pester, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. James P. Garland and Lyle M. Turner, Washington, D. C., on the brief.

LARAMORE, Judge.

This is a suit to recover the alleged overpayments of income tax, plus interest accrued, for the taxable years 1953, 1954, and 1955. The defendant counterclaims for the years 1953 and 1954.

Plaintiff [1] is the owner of 100 percent of the shares issued and outstanding of a corporation named Don Gilmore—San Francisco. He is also the owner of 60 percent of the issued and outstanding stock of a second corporation, Don Gilmore—Riverside. In addition, he is the owner of $73\frac{1}{3}$ percent of the stock issued

---

1. Sue Gilmore is the present wife of plaintiff. They were married on November 1, 1955. Hereafter, any reference to the term "plaintiffs" in the plural number, pertains to the tax year 1955 only and refers to both Don and Sue Gilmore. The singular "plaintiff" refers solely to Don Gilmore.

and outstanding of a third corporation, Don Gilmore—Hayward. Each of the three named corporations is a franchised dealer of a division of General Motors Corporation. Each of these businesses operated under an annually renewable franchise contract which contained a clause giving the manufacturer the unilateral right to terminate the franchise on a 90-day notice. The plaintiff is, and for many years has been, the president and principal managing officer of each of the three above-mentioned corporations. He has received the following combined gross salaries from them:

| | |
|---|---|
| 1949 | $79,800.00 |
| 1950 | 61,316.65 |
| 1951 | 66,799.92 |
| 1952 | 66,799.92 |
| 1953 | 66,799.92 |

From his ownership of stock he received as dividends:

| | |
|---|---|
| 1948 | $109,484.80 |
| 1949 | 69,438.23 |
| 1950 | 50,663.48 |
| 1951 | 114,625.65 |
| 1952 | 73,044.00 |
| 1953 (D. Gilmore—San Francisco only) | 39,657.02 |

The only income of plaintiff from sources unrelated to these automobile dealerships for the years in suit was $1,024.90 in 1953, and $516.60 in 1954.

From March 2, 1946 to October 25, 1955, plaintiff was married to one Dixie Gilmore. During all of this time the couple were residents of California. On April 8, 1952, they separated. Two days later, Dixie Gilmore filed for divorce in the Superior Court of the State of California in and for the County of Marin where the parties resided. On June 16, 1952, the plaintiff in the instant case filed an answer to the complaint and a cross-complaint for divorce. This action came to trial, commencing March 16, 1953, and continuing on order until April 24, 1953. The trial court found in favor of Don Gilmore, granting him an interlocutory divorce, denying the divorce to the wife, and decreed that there was no community property of the marriage.

Within the time allowed, Dixie Gilmore appealed this interlocutory judgment to the District Court of Appeals, State of California, First Appellate District. That court, on April 26, 1955, entered its decision reversing the judgment below and ordering a new trial. Thereupon, Don Gilmore petitioned for a hearing of the appeal in the Supreme Court of California. A hearing was granted in the case, and the decision of the District Court of Appeals was vacated by the Supreme Court, and the judgment of the trial court in all respects affirmed by it on September 23, 1955. After the Supreme Court had affirmed the interlocutory judgment of divorce, a final judgment of divorce in favor of Don Gilmore and against Dixie Gilmore was entered in the trial court on October 25, 1955. As a result of the protracted litigation proceedings, Mr. Gilmore was required to pay legal fees in the amount of $32,537.15 for the year 1953, $8,074.21 for the year 1954, and approximately $5,300 for the year 1955.

The question of community property was an important one during the divorce proceedings. Prior to plaintiff's marriage in 1946, the value of his stockholdings in the three automobile dealerships was approximately $200,000. At the time of their separation, the value of these stockholdings had risen to approximately $800,000. This is an appreciation of $600,000, and it was the contention of Dixie Gilmore that this appreciation was community property. On this basis she contended that she was entitled to one-half the amount, but she was willing to settle for $275,000.

Plaintiff timely filed his individual income tax return for all three years in question. Among other things, plaintiff took a deduction of 80 percent of the cost of the fees involved in the divorce proceedings as an expense incident to the defending of properties and investments. He also claimed deductions in his returns of the full amount of certain State

taxes which were due on his full salary. Plaintiff, because he is an employee, had a certain amount of his wages withheld by his employer. In estimating his tax liabilities for 1953 and 1954, plaintiff credited himself with the full amount withheld.

Upon an audit of plaintiff's 1953 and 1954 individual income tax returns the Commissioner of Internal Revenue made a number of disallowances and adjustments, based on the following determinations:

(a) The principal disallowances resulted from the Commissioner's determination that the attorneys' fees, accountant's fee, court reporters' fees, and printing costs, which Don Gilmore paid in 1953 and 1954 in connection with the divorce action, were personal expenditures of Don Gilmore and were not deductible under Section 24(a) of the 1939 Internal Revenue Code, 26 U.S.C. § 24(a).

(b) The Commissioner determined that only $9,762, or one-half of the $19,524 income taxes withheld from Don Gilmore in 1953 should be credited to him, and this resulted in a finding by the Commissioner that $4,881 of the tax liability reported on the 1953 return of Don Gilmore had never been paid.

(c) The Commissioner of Internal Revenue also determined that of the $5,643.10, which Don Gilmore had paid in 1953 for State income and unemployment taxes, Mr. Gilmore was entitled to a credit in his return of only one-half, or $2,821.55, and that the balance was deductible by Dixie Gilmore.

(d) In his 1953 income tax return, Don Gilmore had erroneously reported that of the $66,799.92 of salaries paid to him during that year, the amount of $50,099.92 was taxable to himself individually and the balance of $16,700 was taxable to Dixie Gilmore. The error caused his individual income for the year 1953 to be overstated by the amount of $16,699.96. This error was recognized by the Commissioner of Internal Revenue, who made an adjustment showing that only one-half of the total salaries paid were taxable to Don Gilmore individually.

As a result of various disallowances and adjustments the Commissioner assessed deficiencies in income taxes against plaintiff as follows:

| Year | Tax | Interest | Total |
|------|-----|----------|-------|
| 1953 | ........$18,883.26 | $4,264.25 | $23,147.51 |
| 1954 | ........ 3,762.21 | 583.12 | 4,345.33 |

On November 1, 1955, Don Gilmore and Sue Gilmore were married. When they filed their joint income tax return on April 15, 1956, they claimed a credit for all taxes withheld from Don Gilmore's salary in 1955. In addition they reported as income the total amount of the salary as their joint income. They filed a timely claim for refund of income taxes paid for the year 1955 on the grounds that income received prior to October 25, 1955, was the community property of Don and Dixie Gilmore and that one-half is taxable to Dixie Gilmore.

The defendant in this case asserts a counterclaim against Don Gilmore for the years 1953 and 1954. As a result of the Commissioner's adjustments concerning the income tax returns of Dixie Gilmore, it was determined that she had a tax balance due of $3,863.78, plus interest for the year 1953. It was similarly determined that she owed $78.93, plus interest, for 1954. A demand for payment was made on Dixie Gilmore on January 7, 1958. Defendant contends that plaintiff, as the husband of Dixie Gilmore, had full and complete control of the community income and is liable for the income taxes of Dixie Gilmore, together with the interest due thereon.

The issues that present themselves are patently discernible from the foregoing

sequence of events and we shall direct our answers in the order that the questions appear.

This court has recently had occasion to review the question of deductibility of legal expenses incurred in divorce litigation. Davis v. United States, Ct. Cl., 287 F.2d 168. In that case the plaintiff attempted to deduct two types of legal fees paid by him; first, legal fees paid for tax advice, and second, legal fees incurred in connection with the protection of income-producing property. This court allowed the deduction as to the first type of legal fees, but denied the deduction as to the second type. In the instant case we are concerned with deductions of the second type; i. e., expenses incurred in connection with the protection of income-producing property.

■ The general rule is that attorneys' fees paid in connection with a divorce are not deductible. Therefore, in order to bring himself under the section permitting the deduction, plaintiff must show that the legal expenses were incurred in matters directly related to his business or the management, conservation, or maintenance of property held for the production of income. Port v. United States, 143 Ct.Cl. 334.

Treasury Regulations 118, promulgated under the Internal Revenue Code of 1939, provide:

"§ 39.24(a)–1 *Personal and family expenses.* * * * Generally, attorneys' fees paid in a suit for divorce or separate maintenance are not deductible. However, the part of an attorney's fee paid in a divorce or seperate maintenance proceeding which is properly attributable to the production or collection of amounts includible in gross income under section 22(k) is deductible under section 23(a) (2). * * *."

In Davis v. United States, supra, we discussed the pertinent cases in this area of the law. We pointed out that there were two groups of cases followed by the courts. One class of authority follows the decision in Lykes v. United States, 343 U.S. 118, 72 S.Ct. 585, 96 L.Ed. 791, and the other class follows the decision in Baer v. Commissioner, 8 Cir., 196 F.2d 646. We indicated a belief that it was not necessary to choose which decision is right in the premises because of factual differences in the two lines of cases. We are still of this opinion. However, the facts in the instant case clearly come under the rule laid down by the court in the latter line of cases. At the time of commencement of the divorce proceedings, plaintiff was 62 years of age; he had spent all his adult life in the retail automobile business; he would not have been able to gain employment in some other business, neither could he obtain employment as president or general manager of an automobile dealership, except through a controlling stock ownership interest. The evidence is clear that the large salary paid to plaintiff was not in return for his services rendered, but because he was the controlling stockholder. It is not too difficult to imagine that an irate ex-wife, if she gained control of a corporation, would dispose of her ex-husband as president. Thus, plaintiff was fighting not only to protect his income-producing property, but to prevent the loss of his salary as well.

In addition to the possible loss of his income, and the possible loss of 50 percent or more of the appreciation in the value of the stock, plaintiff could have lost his franchise with the General Motors Corporation through a proviso in the contract permitting a termination in the event of:

"Any sale, transfer, relinquishment, voluntary or involuntary, by operation of law or otherwise, of any interest in the direct or indirect ownership or active management of dealership without the prior written approval of Seller."

The sensational nature of the divorce charges of adultery and misconduct, brought by Dixie Gilmore, were published in the local papers. This adverse publicity created a real fear that Gen-

eral Motors might terminate the franchise if the allegations were established and a divorce granted to the wife. Even though Dixie Gilmore took the initiative in raising charges of misconduct, the plaintiff resisted these charges and brought charges of his own. He did this not because he opposed the idea of his wife obtaining a divorce, as evidenced by the fact that six days after the divorce became final he married again, but because of the consequences that would result from a determination that the charges brought against him were well founded. It is important to notice that under California law, the court must award *more* than 50 percent of the community property, and may award *all* of the community property to the innocent spouse in divorces based on extreme cruelty or adultery. There can be little doubt that Dixie Gilmore sought more than a divorce. If that was all she wanted, she received it at the trial level, but this divorce action went all the way to the Supreme Court of California. Dixie Gilmore wanted a substantial part of the income-producing property of plaintiff.

The Internal Revenue Code of 1939, 26 U.S.C. (1946 Ed.), which was in effect at that time, states:

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

"(a) Expenses.

\* \* \* \* \* \*

"(2) Non-trade or non-business expenses.

"In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income."

Of course it is true that in every divorce case a certain amount of the legal expenses are incurred for the purpose of obtaining the divorce and a certain amount are incurred in an effort to conserve the estate and are not necessarily deductible under section 23(a) (2), but when the facts of a particular case clearly indicate that the property, around which the controversy evolves, is held for the production of income and without this property the litigant might be denied not only the property itself but the means of earning a livelihood, then it must come under the provisions of section 23(a) (2), supra. The only question then is the allocation of the expenses to this phase of the proceedings. Here, the plaintiff claims that 80 percent of the legal expenses were incurred in the conservation of his income-producing property. The commissioner of this court found that at least 80 percent of the legal expenses were so incurred and this is supported by the evidence. The defendant contends that it is the burden of the taxpayer to establish the exact amount to which he is entitled and, if he cannot meet this requirement, then the deduction must be denied. In considering this contention our attention immediately focuses on the landmark case of Cohan v. Commissioner, 39 F.2d 540, at page 543, where Judge Learned Hand directed the court to this question:

"\* \* \* The Board refused to allow him any part of this, on the ground that it was impossible to tell how much he had in fact spent, in the absence of any items or details. The question is how far this refusal is justified, in view of the finding that he had spent much and that the sums were allowable expenses. Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. \* \*."

This decision has proved a valuable and workable rule over the years and has withstood the attacks made upon it by the Internal Revenue Service. We

948

are not prepared to sanction an outright frontal attack upon this rule.

■ We are of the opinion that the evidence presented by the plaintiff is sufficient to support a finding that 80 percent of the legal expenses incurred in this instance were paid in the conservation of income-producing property. Also, we can find no merit in defendant's further contention that the expenses were actually incurred in defense or perfection of title of a capital asset. The stocks in question belonged to plaintiff before he was married and the wife never suggested that he did not hold perfect title to them. In fact, to do so would have defeated her purpose because if he did not have perfect title in the stocks she could not have asserted an interest in the appreciation thereon. Under these circumstances there can be no question that plaintiff has perfect right to the stocks.

Therefore, following the same rationale as in the Davis case, supra, we reach a contrary conclusion. The facts in the instant case indicate a situation similar to the facts in McMurtry v. United States, 132 F.Supp. 114, 132 Ct.Cl. 418; Baer v. Commissioner, supra; Bowers v. Commissioner, 6 Cir., 243 F.2d 904; and Fisher v. United States, D.C., 157 F.Supp. 364.

We turn next to the question whether the defendant was correct in crediting plaintiff with only one-half of the state taxes paid by him, and one-half of the Federal taxes withheld from his salary for the years 1953 and 1954.

Section 35 of the 1939 Internal Revenue Code provides:

"§ 35. *Credit for tax withheld on wages.*

"The amount deducted and withheld as tax under Subchapter D of Chapter 9 during any calendar year upon the wages of any individual shall be allowed as a credit to the recipient of the income against the tax imposed by this chapter for the taxable year beginning in such calendar year. * * *"

The Regulations then define who the recipient of the income is:

"§ 39.35–1. *Credit for tax withheld on wages.*

" * * * For the purpose of the credit, the recipient of the income is the person subject to tax imposed under chapter 1 upon the wages from which the tax was withheld. For instance, if a husband and wife domiciled in a State recognized as a community property State for Federal tax purposes make separate returns, each reporting for income tax purposes one-half of the wages received by the husband, each spouse is entitled to one-half of the credit allowable for the tax withheld at source with respect to such wages."

■■ The authority in California is clear that the earnings of the husband continue to be community income until the final judgment of divorce. Waters v. Waters, 75 Cal.App.2d 265, 170 P.2d 494. The amounts of these salaries were community income owned equally by Don Gilmore and Dixie Gilmore and one-half of such community income was taxable to Don Gilmore and the other one-half to Dixie Gilmore. In filing his income tax returns for the years 1953 and 1954, the plaintiff arbitrarily attributed a high percentage of the income to himself and a low percentage to his wife. The only way we know that the whole of something may be divided equally into two parts is by dividing it in half. Therefore, we are of the opinion that the defendant was correct in adjusting plaintiff's tax return to reflect this amount of income. This necessarily brings us to the question of what amount of deductions should be allowed to plaintiff considering that only half of the total salaries was taxable to plaintiff individually. We sustain the Government on the issue pertaining to the amount withheld from the salaries. It is apparent that if the salaries are community property, to be divided 50-50, any amount withheld to pay an ob-

ligation of both should be considered to have been withheld from each. This is consistent with Treasury Regulation 118, § 39.35–1, and it appears to be a fair and equitable solution to the problem.

▇▇▇ On the other hand, the answer to the question of which party is entitled to the deduction for California personal income and unemployment taxes is quite different. The general rule is that a taxpayer cannot deduct taxes "paid or accrued" unless he is legally liable to the authority imposing the tax. The applicable California statute provides:

"§ 18555. *Liability of spouses; community income; joint returns.*

"The spouse who controls the disposition of or who receives or spends community income as well as the spouse who is taxable on such income is liable for the payment of the taxes imposed by this part of such income. * * *." California Revenue and Taxation Code, 61 West's Ann.Cal.Codes.

We think this statute establishes the liability of the plaintiff for the state tax responsibilities of his wife. Since plaintiff paid the taxes he is entitled to the deduction. In the case of Al Jolson, 3 T.C. 1184, the husband was entitled to deduct the wife's state income taxes which he paid because he was personally liable under the state law.

▇▇▇ After these adjustments are made there will remain a tax deficiency on the part of Dixie Gilmore for the years 1953 and 1954. The defendant counterclaims for the amounts of these deficiencies on the basis that they are taxes incurred upon the community income of Don and Dixie Gilmore. We agree that the salaries paid plaintiff during this period were community property, but it does not follow that plaintiff is liable for the tax deficiencies of his wife. In our search of the authorities we have been able to find only two unreported cases that stand for the proposition that the community

property is 100 percent liable for the tax liabilities of one of the parties when they had filed separate returns. G. J. Rodgers, 51–2, USTC, ¶9495; R. F. Ryan, 51–2, USTC, ¶9493. The weight of authority is to the contrary. In Marjorie Hunt, 22 T.C. 228, at page 230, the Tax Court stated:

" * * * For purposes of Federal income taxation, each spouse is equally liable for payment of the tax on his or her respective equal share of the community income. United States v. Malcolm, 282 U.S. 792 [51 S.Ct. 184, 75 L.Ed. 714] (1931); Poe v. Seaborn, 282 U.S. 101 [51 S.Ct. 58, 75 L.Ed. 239] (1930). This liability is fixed and definite. It is not a means of splitting income which may be voluntarily chosen or elected to minimize taxes. * * * Her liability for tax ceases only when her interest in the community income ceases. * * *"

Again, in Harrold, 22 T.C. 625, at page 628, the court in referring to the two unreported cases mentioned previously stated:

" * * * It is contrary to a line of cases in which we, and other courts, have held that the powers of management conferred upon the husband by community property laws do not render him personally liable for taxes on his wife's share of the community income. Poe v. Seaborn, 282 U.S. 101 [51 S.Ct. 58, 75 L.Ed. 239] (1930); Paul Cavanagh, 42 B.T.A. 1037 (1940), affirmed on another issue [Commissioner of Internal Revenue v. Cavanagh], 125 F.2d 366 (C.A. 9, 1942); * * * The following explanation given by this tribunal in the Cavanagh case, pages 1043 and 1044 [of 125 B.T.A.], adequately answers petitioner's contention:

" 'The fact that under the California law the husband has a broad power of control does not detract from the wife's. interest. This

power is conferred upon him merely as the agent of the community and does not make him the owner of all the community property and income, nor negative the wife's present interest there as equal co-owner. * * *.'"

Although the Harrold case, supra, was reversed on factual grounds in Harrold v. Commissioner, 9 Cir., 232 F.2d 527, the question whether an overpayment refundable to the husband was to be charged with taxes due from the wife was not considered by the Court of Appeals. The whole concept of community property is a legal fiction. It is no more fictitious to say that the wife earned half the husband's salary by housekeeping than it is to say that each earned half the total income through their own efforts. Once the law accepts the concept of two individuals each owning an equal half of the income and each individual files a separate return that is the end of it. Each party must be treated as an individual, as if they were not husband and wife. In Harrold, supra, the court in attempting to clarify this area of the law emphatically stated at page 629 of 22 T.C.:

"* * * We subsequently emphasized in H. B. Perine et al. [22 B.T.A. 201], supra, that we could not require the respondent to do so, stating in part:

"The spouses became separate and distinct taxpayers under the statute upon the filing of separate returns of the community income, and the situation is no different than it would be if the taxpayers were other than husband and wife. They being separate taxpayers, we lack authority to require the respondent to credit the proposed deficiency determined against the wife with an overpayment of tax by the husband. Alexander Vayssie, 8 B.T.A. 587. Cf. John W. Preston, 21 B.T.A. 840."

■ The defendant cites Clayton v. United States, 44 F.2d 427, 70 Ct.Cl.

740, certiorari denied 283 U.S. 860, 51 S.Ct. 654, 75 L.Ed. 1466, and Lattimore et al. v. United States, 12 F.Supp. 895, 82 Ct.Cl. 97, as supporting the allocation of an overpayment by one spouse to a deficiency of the other. However, in each of those cases the taxpayers originally filed a joint return, indicating that the amount paid with the joint return was intended to be applied to the tax liabilities of each. The defendant also relies on another decision of this court, Santos v. United States, Ct.Cl., 1960, 277 F.2d 806. The obvious distinction is in that case the law applicable was the Hawaiian Code which made the community property liable, not the California Code, and as the defendant points out in its brief:

"Legal rights, liabilities and interests of husband and wife are created by state law, and the Federal revenue laws determine how the interests and liabilities as created shall be subject to income taxes. Trapp v. United States, 177 F.2d 1 (C.A. 10th)."

As a consequence of the above-stated reasons, we find that the defendant is not entitled to recover on its counterclaim.

This brings us to the last issue concerning plaintiff's liability for 1955. The Government concedes that the salaries of plaintiff from January 1, 1955 to October 25, 1955, were community income to him and Dixie Gilmore at the time the divorce became final. Therefore, plaintiffs were required to include only one-half the income received during this period in their 1955 joint tax return. It should be mentioned in passing that the tax return of Dixie Gilmore for 1955 does not indicate a tax deficiency; in fact, there is an overassessment of $1,895.76, which the defendant might apply against Dixie Gilmore's tax deficiencies for 1953 and 1954.

It is so ordered.

JONES, Chief Judge, and DURFEE, MADDEN and WHITAKER, Judges, concur.