[Civ. No. 26869.    Second Dist., Div. Three.    April 21, 1964.]

JACOB G. EFRON et al., Plaintiffs and Appellants, v. PAUL KALMANOVITZ et al., Defendants and Respondents.

Sydney J. Dunitz, Horowitz & Howard and Fred Horowitz for Plaintiffs and Appellants.

Murray M. Chotiner, J. Albert Hutchinson, James J. Arditto and Mel Pierovich for Defendants and Respondents.

548

FORD, J.—The plaintiffs have appealed from a judgment in favor of the defendants in a stockholders' derivative suit wherein minority stockholders challenged the propriety of the sale of assets of the Maier Brewing Company, a corporation, to S & P Company, a corporation. The plaintiffs have also appealed from orders of the trial court with respect to costs claimed by the defendants.[1]

At the time of the pretrial conference the parties were in agreement as to most of the pertinent facts. Such agreement was embodied in the ensuing order and portions thereof will be noted herein. Maier Brewing Company, hereinafter called Maier, was a California Corporation and had its principal place of business in the County of Los Angeles. For more than 50 years it had been engaged in the brewing of beer and other malt products. In that time it had spent "many millions of dollars" in advertising its name and products. It had a good reputation "for brewing and selling of fine quality beer." About May 1, 1950, the defendant Paul Kalmanovitz was the registered owner of 42,428 shares of stock of Maier. Thereafter he acquired additional shares so that, as of June 29, 1958, he held 67,720 shares of the 100,000 issued and outstanding shares of that corporation. Some of the shares were registered in his name and some were registered in the names of various corporations the shares of stock of which were wholly owned by Mr. Kalmanovitz.

S & P Company was a California corporation. Mr. Kalmanovitz and his wife each held 50 per cent of the outstanding shares of the stock of that corporation.

A meeting of shareholders of Maier was held on Sunday, June 29, 1958. Before that day the board of directors was composed of Mr. Kalmanovitz, Henry Greenstone, who is one of the plaintiffs in the present action, and George Alef. At the meeting a new board of directors was elected which consisted of the defendants Chris A. Wasem, George Alef, and R. J. Wallerstein. At that time Mr. Wasem was the sales manager of Maier and his annual salary was $30,000, Mr. Wallerstein was plant manager of Maier and his annual salary was $12,000, and Mr. Alef was employed by S & P Company and by another corporation the shares of stock of which were wholly owned by Mr. Kalmanovitz.

At the stockholders' meeting of June 29, 1958, Mr. Kalmanovitz, acting on behalf of S & P Company, presented an

[1]An earlier phase of the litigation was before the court in 1960. (*Efron* v. *Kalmanovitz*, 185 Cal.App.2d 149 [8 Cal.Rptr. 107].)

offer to purchase certain assets of Maier. That offer is set forth in the footnote.[2]

---

[2]                                        "June 28, 1958

"To Maier Brewing Company,
Its Board of Directors and
Its Shareholders
500 East Commercial Street
Los Angeles, California

"Dear Sirs:

"The S & P Company, a California corporation, hereby make the following offer to Maier Brewing Company (hereinafter referred to as 'Maier' or 'Seller'):

"(1) The S & P Company offers to purchase from Maier all of its business and assets except those hereinafter listed in paragraph 7. The assets being purchased include but are not limited to the land and improvements constituting the brew house, the bottle house, the Center Street warehouse, the 'stable yard' property at the southeast corner of Commercial and Gary Streets, the office building at 500 East Commercial Street (all being in the City of Los Angeles, California), all leasehold improvements on the above-described premises, all furniture, fixtures, machinery and equipment including automotive equipment, Maier's brewer's licenses, permits, trade-marks, trade names, good will (if any), merchandise inventory (including raw materials, materials in process and finished products) as of June 29, 1958, and accounts receivable as of June 29, 1958.

"(2) In exchange for the said assets the S & P Company will pay Maier the sum of $6,000,000, plus the amount of the said inventory reflected on the books of the corporation as of June 29, 1958, and an amount equal to the accounts receivable as shown on the books of the corporation as of June 29, 1958, (less a reserve for bad debts of 5% of such amount).

"(3) Purchase price shall be payable as follows:

(a) The sum of $100,000 shall be paid by S & P Company to Maier upon acceptance of this offer.

(b) The sum of $200,000 shall be paid by S & P Company to Maier at such time as the brewer's licenses issued by the State and Federal Governments are transferred to S & P Company.

(c) The balance shall be payable at the rate of $300,000.00 annually, the first of such payments to be made one year from the date of acceptance of this offer and other payments on successive anniversaries of that date, the entire unpaid balance of principal and interest to be due and payable 10 years from the date of acceptance of this offer. The unpaid balance shall not bear interest for the first five years after date of acceptance of this offer but thereafter the unpaid principal balance shall

550

The offer submitted by Mr. Kalmanovitz was approved by
the vote of shareholders having a majority of the shares and

> bear interest for each year until paid, at the interest
> rate in effect at the commencement of each year for prime
> bank loans in the City of Los Angeles, California. The
> annual payment of $300,000.00 during the second five years
> shall be inclusive of interest and principal and shall be
> applied first to interest then due and the balance to
> principal.

"(4) The real property and improvements to be sold by Maier
shall be sold under contract of sale, with legal title being retained
by Maier until full payment of the purchase price by S & P Company
and then to be deeded to said S & P Company.

"(5) The personal property to be sold hereunder to S & P
Company shall be transferred on conditional sales contract with title
being retained in Maier until full payment of the purchase price by
S & P Company.

"(6) Upon the performance by S & P Company of its obliga-
tions hereunder the seller warrants that it will convey clear title to
the properties herein agreed to be transferred.

> "(7) The assets to be transferred shall not include:
> (a) Any cash of Maier.
> (b) That certain parcel of real property of approxi-
> mately 5 acres in content lying between Aliso,
> Keller, Center and Macy Streets, Los Angeles,
> California.
> (c) the claim of Maier against the State of California
> represented by that certain action entitled Maier
> Brewing Company vs. State of California, Los
> Angeles Superior Court No. 645033.
> (d) any claims for refund of federal and state income
> taxes filed by seller.

"(8) S & P Company will assume no liabilities of Maier,
except as S & P may be required to assume liabilities under contracts
between Maier and any labor unions or organizations.

"(9) S & P Company shall be responsible for real and
personal property taxes on the property sold for the fiscal year 1958-
1959 and subsequent years.

"(10) The seller Maier will pay any sales or use taxes which
may be assessed against either party to this transaction.

"(11) It shall be the obligation of the seller to obtain
consent of governmental authorities to the transfer of all licenses
and permits, but buyer agrees to cooperate in obtaining such consents.

"(12) Seller shall take prompt steps to change its corporate
name to a new name having no material resemblance to the name 'Maier
Brewing Company.'

"(13) If the purchase shall not be consummated because of
the inability of either of the parties by reason or causes beyond its
control to carry out its performance as contemplated by this agreement,
neither party shall be liable to the other for loss, damage or expense,
and the only remedy of either party shall be to terminate or cancel the

the offer was accepted by the new board of directors of Maier.

In response to a request for the admission of facts the plaintiffs stated that, for the purpose of the action, they admitted that as of June 29, 1958, the Maier assets sold to S & P Company had a fair market value of $7,708,605.25 cash. That was the total sales price as tentatively computed in accordance with the offer, but the amount to be paid was ultimately determined to be $7,761,193.49. ▮ The plaintiffs contended, however, that the terms of the sale were unfair and fraudulent.

The findings of fact of the trial court were in part as follows: 1. The terms of payment of the purchase price were fair to Maier and to each and all of its shareholders. 2. No fraud or fraudulent act was carried out by any defendant as against Maier or any of its shareholders with respect to the subject matter of the action. 3. The net profits of Maier before payment of income taxes for the period of 1958 were $219,505.28. 4. Payments have been made by S & P Company to Maier on or before the dates designated in the offer of purchase and the conditional sales contract and promissory note executed pursuant thereto. 5. S & P Company has changed its name to Maier Brewing Company and Maier has changed its name to Keller Street Development Company. 6. The defendants, and each of them, have incurred expenses,

agreement, provided that Maier shall repay to S & P Company all sums paid to Maier hereunder.

"(14) This agreement is assignable and may be assigned by the buyer to any person or corporation, but assignment shall not release the buyer from its obligations hereunder.

"(15) This offer may be withdrawn unless accepted on or before June 29, 1958.

"(16) This agreement shall be superseded only by formal written documents embodying the terms herein contained.

"Your attention is expressly called to the fact that Mr. Paul Kalmanovitz, president and shareholder in Maier Brewing Company, owns a substantial interest in S & P Company and is an officer and director of said corporation.

"Very truly yours,
S & P Company
By _____
Paul Kalmanovitz

"ACCEPTED JUNE 29, 1958
MAIER BREWING COMPANY
By_____
By_____ "

including attorneys' fees, which were reasonable and necessary in the defense of the action. The conclusions of law were that the agreement for the sale of the assets of Maier and the conditional sales contract and promissory note supplementing that agreement were "in all respects fair, proper and lawful as to all parties," including Maier and all of its shareholders, and that the defendants were entitled to have a judgment for their costs, including such expenses and attorneys' fees as were reasonable and necessary in the conduct of the defense to the action. Judgment was entered accordingly.

A summary will be given of evidence relating to the propriety of the challenged transaction.

Defendant Paul Kalmanovitz testified that he became a director of Maier in 1950 and remained a director until the election of a new board of directors on June 29, 1958. For some years he was executive vice president and was elected to the office of president about 1955. Starting about 1953 or 1954, he had frequent discussions with persons connected with Maier upon the subject of the sale of the brewery. He testified in part as follows: "On each and every occasion when Mr. Greenstone [one of the plaintiffs] called at the Maier Brewing Company offices invariably the discussion would be trying to dispose of the brewery."

About the 11th of June of 1958 Mr. Kalmanovitz was thinking of buying the brewery on his own account or for the S & P Company. Mr. Greenstone, who was then a director of Maier, and Mr. Kalmanovitz met about that time. In the course of their discussion Mr. Kalmanovitz said: "I'll tell you what I want to see you about. We're going to sell the brewery." Mr. Greenstone's response was that it was "the smartest thing" he could do. Mr. Kalmanovitz further said: "Well, I can start negotiating. I have a few people in mind." In the course of the conversation, Mr. Kalmanovitz also stated: "We made in five months $334,000. And the best months are coming, July, August, September and October."

After his meeting with Mr. Greenstone, Mr. Kalmanovitz asked an attorney, who had done legal work for Maier for some years, to prepare an offer on behalf of the S & P Company. About June 22, 1958, Mr. Kalmanovitz had a telegram sent to Mr. Greenstone for the purpose of calling a meeting of the board of directors of Maier. Mr. Greenstone came to the office of the corporation and Mr. Kalmanovitz told him that he wanted to resign as a director of Maier. Mr. Kalmanovitz also testified that he believed that he stated to

Mr. Greenstone that he wanted to represent the purchaser. Mr. Greenstone refused to sign a waiver with respect to the meeting and departed.

At the meeting of the shareholders on June 29, 1958, Mr. Kalmanovitz presided. Mr. Efron, one of the plaintiffs in the present case, voiced objections to the proposed sale. The plaintiffs Rubino, Taber, Seymour and Greenstone voted against acceptance of the offer. Mr. Kalmanovitz did not attend the meeting of the new board of directors which was thereafter held.

Mr. Kalmanovitz expressed the opinion that as of June 29, 1958, the reasonable and fair market value of the assets sold by Maier, excluding the accounts receivable and the inventory was $4,000,000. Of this amount he allotted about $550,000 to land, $1,500,000 to buildings, $1,500,000 to equipment other than automotive equipment, and $450,000 to $500,000 to automotive equipment. He further testified that the inventory was worth what it had cost and that the accounts receivable had a value of 95 per cent of face amount.

Mr. Kalmanovitz testified that he assigned a very nominal value to good will because of the uncertainty involved in the operation of a business of the nature of that of Maier. As of June 29, 1958, most of the labels under which Maier's beer was sold were private labels owned by Maier's customers. If the good will had any value, it was in an amount between $200,000 and $300,000. But Mr. Kalmanovitz further said that no value is attached to good will in the sale of a brewery.

Mr. Kalmanovitz also testified as to the operations of Maier over a period of years. Prior to the initiation of an advertising campaign in 1950, sales were very low. In 1953 beer under the Maier trade name had the largest sales of any brand in Southern California. Thereafter the sales volume dropped substantially for several years but subsequently rose again. Beginning in 1954, Maier increased its sales by marketing beer under additional trade names and by producing beer for other concerns for sale under their private labels. In 1958, about 95 per cent of the production was in the private label category. The product, under whatever name it was sold to the consumer, was of a uniform quality. In 1951, Maier produced 355,626 barrels; in 1952, 468,498 barrels; in 1953, 418,292 barrels; in 1954, 233,795 barrels; in 1955, 149,384 barrels; in 1956, 158,376 barrels; in 1957, 220,015 barrels; and in 1958, 329,029 barrels.

Mr. Kalmanovitz testified that one of the reasons for his

belief that the assets should be sold was the hazardous nature of the brewery business, but that there were "other very good reasons." In response to the next question addressed to him, which was whether that was one of the reasons for his desire to make the purchase, Mr. Kalmanovitz replied: "Well, I would say that was one of the reasons. I like to operate without interference from my minority stockholders which were constantly—well, I would say that would be one of the reasons, yes." Mr. Kalmanovitz also testified that prior to 1958, Maier attempted to borrow money, aside from obtaining credit for such matters as the purchase of ordinary supplies, but had been able to do so only when Mr. and Mrs. Kalmanovitz became guarantors with respect to such an obligation. In the five years prior to 1958 Maier declared no dividends because capital expenditures exceeded the net earnings and the company was without sufficient funds with which to continue in business if dividends were paid.

When the sale was made the S & P Company had assets of a value of $2,000,000 to $2,500,000 and obligations of about $280,000. At the time of the trial in November of 1961, the S & P Company had paid to Maier more money than it was required to pay under the terms of the agreement in the period of time which had elapsed since the acceptance of the offer of purchase. The total amount so paid was $1,761,193.49. Mr. Kalmanovitz stated that thereby the payments for the period of the first five years had already been made. The S & P Company had also spent $1,258,975.71 for the improvement of the brew house facilities, the erection of a new bottle house or warehouse, and other capital purposes.

The defendant George Alef, who held the office of secretary of Maier on June 29, 1958, estimated that the number of shareholders of Maier was then between 100 and 125. He was the person who read the offer to purchase at the shareholders' meeting. Immediately after the shareholders' meeting, the new board of directors met for approximately 20 or 30 minutes and accepted the offer. He considered it to be a fair transaction.

The defendant Robert J. Wallerstein testified that before the sale in 1958 he was vice president and general superintendent of Maier. He owned 250 shares of stock. He first saw the offer of purchase on the morning of June 29, 1958, in the Maier office. He obtained it from the attorney who had prepared it and he read it. In his judgment the proposal was sound, fair and reasonable.

The defendant Chris A. Wasem testified that he started

working for Maier in October 1954. Before the sale in 1958 he was vice president in charge of sales. He was never a shareholder. On the Friday prior to June 23, Mr. Kalmanovitz asked him if he would be willing to be a director and president of Maier. He and Mr. Kalmanovitz had discussed the matter of selling the brewery a few days before that time. On June 24 or 25, he learned from Mr. Kalmanovitz that the S & P Company was considering the presentation of an offer of purchase. When the offer came before the board of directors, it was discussed for about 20 minutes. The terms of payment were not discussed at any great length. Mr. Alef stated that the accounts receivable and the inventory were in the total amount of approximately $1,600,000 or $1,700,000. He considered the terms of the offer to be reasonable and just to Maier and its stockholders.

Mort Ballagh, a licensed real estate broker, testified that about 1955 Mr. Kalmanovitz asked him to obtain a purchaser for Maier and that he subsequently undertook to do so. About the middle of June in 1958 Mr. Kalmanovitz again discussed the subject with him. The witness told him that he did not believe that that was an opportune time for the sale of the brewery and that he had no knowledge of anyone who would then be interested in acquiring the brewery. In his opinion the land had a value of about $500,000, the buildings were worth $1,000,000, and the value of the equipment, other than the mobile equipment, was approximately $1,500,000. When Mr. Kalmanovitz mentioned to him the terms of the proposed purchase, Mr. Ballagh told Mr. Kalmanovitz that he thought that $6,000,000 was a very equitable price for the property and that, as long as the purchasers were substantial persons, it was a fair deal "regardless of the terms." He also told him that the payment of interest had no bearing on the matter "because lots of people sell property without interest involved in it for various reasons, either for tax purposes or to assist the purchaser in acquiring the property, so that he may have relief from interest burden," and that there are "many, many reasons why people buy property without the payment of interest." Mr. Ballagh also said that adequate guaranties would have to be furnished by the purchaser. The price mentioned did not include the transfer of the accounts receivable and the merchandise inventory. In the course of that conversation Mr. Kalmanovitz did not mention any particular purchaser and he did not show any writing to Mr. Ballagh.

The plaintiff Henry Greenstone owned 9,872 shares of Maier stock and the plaintiff Harvey Seymour owned 4,300 shares on June 29, 1958. Such holdings had remained substantially the same for the period of a year prior thereto. In 1960 Mr. Greenstone's wife bought 100 shares of stock of Maier for $11 a share. After the sale, in 1958 or 1959 the wife of the plaintiff Jacob G. Efron purchased shares of stock of Maier, as her separate property, for about $8.50 a share.

Attention will be directed to other portions of the evidence in the course of the discussion of the applicable law.

■ The basic principle governing the resolution of the problem presented in this case was expressed in *Pepper* v. *Litton*, 308 U.S. 295, at page 306 [60 S.Ct. 238, 84 L.Ed. 281, 289], as follows: "A director is a fiduciary. [Citation.] ■ So is a dominant or controlling stockholder or group of stockholders. [Citation.] ... ■ Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. [Citation.] The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside." That reasoning was quoted and adopted by the court in *Remillard Brick Co.* v. *Remillard-Dandini*, 109 Cal.App.2d 405, at pages 420-421 [241 P.2d 66].[3] (See also *Mayflower Hotel Stockholders Protective Committee* v. *Mayflower Hotel Corp.*, 173 F.2d 416, 423; *Lebold* v. *Inland Steel Co.*, 125 F.2d 369, 372-373; *Allied Chemical & Dye Corp.* v. *Steel & Tube Co.*, 14 Del.Ch. 1 [120 A. 486, 491]; *Weisbecker* v. *Hosiery Patents*, 356 Pa.

---

[3]It was also aptly stated in the *Remillard* case (109 Cal.App.2d, at pp. 418-419): "But neither section 820 of the Corporations Code nor any other provision of the law automatically validates such transactions simply because there has been a disclosure and approval by the majority of the stockholders. ... Even though the requirements of section 820 are technically met, transactions that are unfair and unreasonable to the corporation may be avoided. (California Corporation Laws by Ballantine and Sterling (1949 ed.), p. 102, § 84.) It would be a shocking concept of corporate morality to hold that because the majority directors or stockholders disclose their purpose and interest, they may strip a corporation of its assets to their own financial advantage, and that the minority is without legal redress."

244 [51 A.2d 811, 813-814] ; Stevens on Corporations (2d ed. 1949) § 126; 3 Witkin, Summary of Cal.Law (7th ed. 1960) Corporations § 99, pp. 2390-2391; Finch and Long, *The Fiduciary Relation of the Dominant Shareholder to the Minority Shareholders*, 9 Hastings L.J. 306, 308.)

█ The burden of proof was upon the dominant shareholder, Mr. Kalmanovitz, to prove that the transaction was undertaken in good faith and that it was inherently fair from the viewpoint of the corporation and its shareholders. (See *Tevis* v. *Beigel*, 156 Cal.App.2d 8, 15 [319 P.2d 98].) That burden could not be sustained by a showing of a desire on the part of Mr. Kalmanovitz to eliminate one or more of the minority shareholders whom he deemed to be obnoxious.[4] (See O'Neal and Derwin, Expulsion or Oppression of Business Associates (1961) § 4.08, p. 80.) █ But, while the plaintiffs have conceded that the total purchase price was adequate, a difficult problem is presented by the contention that the evidence did not support the determination of the trial court that the terms of payment were fair to the selling corporation. As stated by the chancellor in *Allied Chemical & Dye Corp.* v. *Steel & Tube Co., supra*, 14 Del.Ch. 1 [120 A. 486, at p. 491] : "The price to be paid, the manner of payment, the terms of credit, if any, and such like questions, must all meet the test of the corporation's best interest."

It has been noted that the purchase price was "the sum of $6,000,000, plus the amount of the said inventory reflected on the books of the corporation as of June 29, 1958, and an amount equal to the accounts receivable as shown on the books of the corporation as of June 29, 1958, (less a reserve for bad debts of 5% of such amount)." It was determined that the inventory had a value of $416,381.32 and the accounts receivable a value of $1,344,812.17. Hence the total price was $7,761,193.49. It is true that as of the time of the trial in November 1961, $1,761,193.49 had been paid on account of the purchase price, leaving a balance of principal of $6,000,000, but the transaction is to be judged in the light of

---

[4]In addition to his testimony as to the hostility between him and Mr. Greenstone, Mr. Kalmanovitz testified: "I was sick and tired by the minority stockholders trying to destroy the brewery. . . . I was sick and tired [of] Mr. Seymour trying to negotiate and sell the brewery when he was not authorized, and by doinᵍ that he was destroying my hard work and efforts for four years to build it up, a business of private label and did not enjoy it in having 68%, having minority stockholder going out and destroy my entire effort which I put into the brewery."

the terms of the offer which was accepted. Thereunder the purchaser was required to make initial payments of a total amount of $300,000 and to pay the balance at the rate of $300,000 annually, the first of such annual payments to be made one year from the date of the acceptance of the offer of purchase. No interest was payable on the unpaid balance for the first five years, but thereafter the unpaid balance of the purchase price was to bear interest "at the interest rate in effect at the commencement of each year for prime bank loans in the City of Los Angeles," such interest to be included in each annual payment of $300,000 made during the period of "the second five years." The entire unpaid balance of principal and interest was to be due and payable 10 years after the date of the acceptance of the offer. Title to both real and personal property was to be retained by Maier until payment in full should be made of the purchase price by S & P Company.

The inventory and accounts receivable were assets of a liquid nature, but under the terms of the agreement the value thereof would not be fully received by Maier until five years after the acceptance of the offer of purchase. In the meantime, no interest was payable with respect to any part of the unpaid balance of the purchase price. During the second five-year period the payments to be credited to the principal of the purchase price pursuant to the terms of the agreement would be of such amounts that when the unpaid balance became due at the end of that period, such balance would be in an amount of approximately five million dollars or more, depending on the governing interest rate. In view of Mr. Kalmanovitz's analysis of the uncertainties of the brewery business, there was a substantial hazard that at that time the purchaser would be unable to make a final payment of such magnitude and that, in that event, Maier would not be in a favorable position to reenter the business and to make profitable use of the assets the possession of which would then revert to it. It cannot be said that an overvaluation of $2,000,000 placed on the physical assets of Maier in the agreement of purchase constituted a material advantage to Maier and its shareholders in view of the substantial uncertainty that such sum of $2,000,000, or any part of it, would ultimately be received by Maier. In the meantime, prior to the date when the final payment would become due, S & P Company was placed in a position to reap full advantage of the use of the assets of the brewery for its own gain and

profit at moderate cost to it in the form of substantial payments to Maier on account of the purchase price.[5]

■ "The question of fairness is ordinarily one of fact for the trial court and its decision will not be disturbed unless it appears from the record that such decision cannot be supported upon any reasonable view of the evidence and the inferences to be drawn therefrom." (*Armstrong Manors v. Burris*, 193 Cal.App.2d 447, 460 [14 Cal.Rptr. 338].)

■ But in the present case the record does not sustain the determination of the trial court that the agreement for the sale of Maier's assets "was and is in all respects fair, proper and lawful as to all parties," including Maier and all of its shareholders.[6] In the absence of more substantial justification for his action than appears in the present record, Mr. Kalmanovitz's conduct as the dominant shareholder constituted constructive fraud. ■ As stated by Mr. Justice Vallée, speaking for this court in *Estate of Arbuckle*, 98 Cal.App.2d 562, at page 568 [220 P.2d 950, 23 A.L.R.2d 372]: "Fraud assumes so many shapes that courts and authors have ever been cautious in attempting to define it. Each case must be considered on its own facts. [Citation.] In its generic sense,

---

[5]Mr. Kalmanovitz testified that the number of barrels of beer sold in 1959 was approximately 420,000 barrels. He further testified that 1960 "was a very good year and the sales increased and we did in excess of 500,000 barrels."

With respect to the officers and directors of Maier and of the S & P Company in the period of June 29, 1958, through March 2, 1959, Mr. Kalmanovitz's counsel made the following statement: "Maier, now Keller, the directors were Mr. Alef, Mr. Wasem and Mr. Wallerstein. The officers were Mr. Wasem president, Mr. Wallerstein vice president, John A. Weis vice president, George Alef secretary-treasurer. S & P, now Maier, the directors were Mr. and Mrs. Kalmanovitz— ... The officers were Mr. Kalmanovitz president, Mr. Weis vice president, Mr. Wasem vice president, Mr. Wallerstein vice president and treasurer, Mr. Alef secretary. . . ."

[6]In the course of a discussion of "squeeze-out techniques," it is said in O'Neal and Derwin, Expulsion or Oppression of Business Associates (1961) § 4.08, page 79: "Majority shareholders may organize a new corporation, taking all the shares themselves, and then cause the old company to sell its business and assets to the new company, perhaps at an inadequate price. The newly organized corporation may be given a name similar to that of the old company, the directors and officers of the old company may become directors and officers of the new one, and the business may continue very much the same as before. Even if the old company receives a fair price for the assets, the minority shareholders are eliminated from a prosperous going concern and are deprived of the prospect of enjoying future earnings from a promising business enterprise."

constructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust or confidence, and resulting in damage to another. [Citations.] Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated—that is, in which such conduct is a constructive or quasi fraud, having all the actual consequences and all the legal effects of actual fraud. [Citations.]" ▇▇ To uphold the judgment of the trial court would be to justify conduct not consonant with the law hereinabove set forth as to the fiduciary duty of a dominant shareholder.

Since the judgment cannot stand, it is unnecessary to consider the contentions with respect to costs allowed to the defendants.

The judgment is reversed. The portion of the appeal relating to the orders taxing costs, being moot, is dismissed.

Shinn, P. J., and Files, J., concurred.

A petition for a rehearing was denied May 19, 1964, and respondents' petition for a hearing by the Supreme Court was denied June 16, 1964.