**KELLER STREET DEVELOPMENT COMPANY, et al.,**
**Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 81–7335.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 3, 1982.

Decided Sept. 23, 1982.

Robert J. Lowe, Kindel & Anderson, Los Angeles, Cal., argued, for petitioners-appellants; John W. Armagost, Los Angeles, Cal., on brief.

Kenneth L. Greene, Washington, D.C., argued, for respondent-appellee; Ann Belanger Durney, Washington, D.C., on brief.

Before HUG, TANG and PREGERSON, Circuit Judges.

HUG, Circuit Judge:

## I

## OVERVIEW

Keller Street Development Company ("Keller") appeals the Tax Court's decision that certain monies, received by Keller as a result of a sale of assets and subsequent litigation, are to be treated as ordinary income. Keller sold a brewery to Maier Brewing Company ("Maier") in 1958. The day after the sale, Keller's minority shareholders brought a derivative suit. After ten years of litigation in the California courts, a final judgment was issued, detailing the terms of sale the court deemed necessary to make the transaction fair to all parties. One element of the new terms ordered by the court was a $2,432,175.45 sum designed to compensate Keller for the fact that Maier was holding, and had the benefit of, the brewery assets for the ten years of litigation.

Keller treated that amount as an adjustment in the sales price, hence, a capital gain. The Commissioner issued a deficiency notice, contending the sum was a substitute for ordinary income and should be taxed as such. The Tax Court held for the Commissioner. *Keller Street Development Co. v. Commissioner,* T.C.M. (CCH) 1978–350 (1978).

The result reached by the Tax Court is correct. We believe, however, that we must reconcile the analysis used to reach that result with the teachings of the Supreme Court and the law of this circuit. It is necessary, therefore, to discuss in some detail the issues presented by this case.

## II

## BACKGROUND

On June 28, 1958, Paul Kalmanovitz, Keller's majority owner, resigned from its board of directors in order to present an offer from Maier, wholly owned by Kalmanovitz, to buy Keller's brewery assets. Keller had virtually no credit at that time, and was facing serious cash flow problems. *See Efron v. Kalmanovitz,* 226 Cal.App.2d 526, 38 Cal.Rptr. 148, 153 (1964). Its minority shareholders wished to liquidate the company assets and obtain a cash distribution. Kalmanovitz, on the other hand, wished to continue the operation of the brewery. *See Keller v. Commissioner,* T.C.M. (CCH) 1978–350, at pg. 1453. He sought to do so through the use of Maier.

Maier offered Keller $7,708,605.25 for the brewery. That amount was broken down to six million dollars for capital assets, and $1,708,605.25 for accounts receivable and inventory.[1] The terms of payment called for $100,000 cash, $200,000 upon transfer of certain brewer's licenses, and $300,000 per year for five years. During those five years, no interest was to be accrued. After the fifth year, the remaining principal would accumulate interest at the prime rate charged by Los Angeles banks. The total balance owed was to be due in the tenth year. The Keller board accepted the offer, and it was approved by a majority of the shareholders on the same day. *Id.*

The following day, June 29, 1958, Keller's minority holders filed a derivative action seeking rescission, challenging the sale as fraudulent and unfair.

After ten years of litigation, including two trips to the California Court of Appeal, a final judgment was filed by the superior court, redesigning the sale in a manner deemed more fair to the minority holders. The court found that the fair capital asset price for the brewery in 1958 was four million dollars. It made no finding as to a fair deferred price, other than to label the 1958 sale contract unfair and constructive fraud. In short, the court found the following amounts and adjustments to be fair:

*Sale Price Owed to Keller*

(A) $1,761,193.49 accounts receivable and inventory.

(B) $365,000 other rent.

(C) $6,300,000 brewery assets.

*Credits Allowed to Maier (reducing sale price)*

(A) $3,000,000 in payments made on 1958 agreement.

(B) $2,000,000 for improvements in assets not reflected in fair market value.

In addition to adjusting the terms of the sale, the court wished to compensate Keller for the loss of the use of the brewery during the ten years that it took to resolve the legal conflict. Because significant capital improvements by Maier made impossible any tracing of the value earned by the assets transferred in 1958, the court decided to apply an interest rate to the 1958 fair market value of those assets. As a result, an additional sum was found owed to Keller in the amount of $2,432,175.45. That amount was designated by the court as "reasonable compensation—to [Keller] for the use by [Maier], of such transferred brewery assets during the period subsequent to June 29, 1958 and as a substitute for such product or profit."

In addition to its quantitative analysis of the asset sale, the court ordered new terms of payment: Keller received a $558,373.94 cash payment, with the balance owed payable in $400,000 yearly installments. The court set the interest rate at seven percent for the first two years, and gave the parties the right to renegotiate the rate for the following years.

The court also ordered Keller, Maier, and Kalmanovitz to purchase, for $55 per share, any Keller stock tendered to them by the minority holders. The minority holders also received a $500,000 attorneys' fees award.

At issue in the case before us is the tax treatment of the $2,432,175.45 payment received by Keller as a substitute for "product or profit." Keller treated it as an adjustment in the amount received from the sale of a capital asset, and hence, reported a capital gain. The Commissioner believed that the amount should have been treated as ordinary income, and prevailed in the Tax Court.

The Tax Court's analysis began with a preliminary determination that the origin of Keller's tax claim was the minority holders' suit for rescission. It then looked at the "nexus between the origin of the claim settled and the basis upon which settlement was reached." *Keller v. Commissioner,* at 1461. It concluded that "the nexus ... is that of a claim of rescission with the $2,432,175.45 payment made as a direct re-

---

1. The Tax Court notes that this amount was "ultimately determined to be $7,761,193.49 instead of $7,708,605.25." *Keller v. Comm'r,* at stead of $7,708,605.25." *Keller v. Comm'r,* at

n.2. This adjustment came about through an increase in the amount allowed for accounts receivable and inventory.

sult of the rescission." *Id.* at 1462. Because the rescission payment was required in order to compensate Keller for the loss of use of the brewery, and the revenue received from such use would have been treated as ordinary income, the Tax Court decided that the substitute payment in rescission must also be treated as ordinary income. *Id.* at 1463.

## III

## DISCUSSION

### A. *Standard of Review*

■ The Tax Court's factual findings and inferences must be affirmed unless they are clearly erroneous. *Estate of Skaggs v. Commissioner,* 672 F.2d 756, 757 (9th Cir. 1982) (per curiam). In its application of law to the facts, "we consider that the tax court has exercised that degree of special expertise which Congress has intended to provide in that tribunal, and that this court should not overrule that body, unless some unmistakable question of law mandates such a decision." *Sibla v. Commissioner,* 611 F.2d 1260, 1262 (9th Cir. 1980).

The focus of our discussion will be a question of law; that is, the Tax Court's definition and application of the "origin of the claim" test.[2] Even if we conclude that the Tax Court erred in applying the test, however, we may still affirm its ultimate result on any basis supported by the record. *See United States v. Washington,* 641 F.2d 1368, 1371 (9th Cir. 1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982) (district court's result).

### B. *Origin of the Claim*

Characterization of a transaction for taxation is a two step process. The initial step is to discover the origin of the claim from which the tax dispute arose. This attribu-

tion determination is critical to proper tax characterization because of the inherently factual nature of taxation. Once a transaction is placed in its proper context, the nature of that transaction becomes discernible, and its tax character may be identified. Thus, the second step, the actual tax characterization, is dependent upon the proper resolution of the preliminary attribution question. ·

Attribution through the "origin of the claim" test was first explained by the Supreme Court in *United States v. Gilmore,* 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963), and its companion case, *United States v. Patrick,* 372 U.S. 53, 83 S.Ct. 618, 9 L.Ed.2d 580 (1963).

*Gilmore* involved divorce litigation. The main issue in the divorce proceedings was the disposition of the husband's controlling interests in three corporations. The husband argued that his "primary purpose" in so vigorously litigating the divorce was to protect his capital investment in the corporations. That purpose, he asserted, allowed him to deduct his litigation expenses as expenditures for the conservation of property held for the production of income. *See* Section 23(a)(2) of the Internal Revenue Code of 1939.

The Court of Claims allocated the litigation expense between personal and income preservation motives, allowing a deduction for 80 percent of the expense. *Gilmore v. United States,* 290 F.2d 942 (Ct. Cl. 1961). The Supreme Court reversed.

Relying on *Lykes v. United States,* 343 U.S. 118, 72 S.Ct. 585, 96 L.Ed. 791 (1952), the Court rejected the notion that the attribution process is based on the consequences to the taxpayer if he fails in his defense of a legal action. *Gilmore,* 372 U.S. at 43–44, 46–48, 83 S.Ct. at 627–28. In other words, the Court rejected the notion that attribu-

---

**2.** Keller raises two other issues: first, that the payment in question, because of the various credits allowed, was never received; and second, that the payment was deductible as a claim of right. The first argument, as the Tax Court noted, places form over function and, therefore, must be rejected. *Keller v. Comm'r,*

at 1463–64; *See Comm'r v. P.G. Lake, Inc.,* 356 U.S. 260, 266–67, 78 S.Ct. 691, 695, 2 L.Ed.2d 473 (1958). The second argument was not raised below, thus, we do not reach it. *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).

tion is a forward-looking process. It held instead that "the characterization, as 'business' or 'personal,' of the litigation costs of resisting a claim depends on whether or not the claim *arises in connection with* the taxpayer's profit-seeking activities. It does not depend on the *consequences* that might result ... from a failure to defeat the claim ...." *Gilmore,* 372 U.S. at 48, 83 S.Ct. at 628 (emphasis in original).

Thus, as noted earlier, the characterization process has a preliminary step: the cost (or income) at issue must be attributable to a business activity to be a business expense, a personal activity to be a personal expense, or a capital activity to be an adjustment in the value of the capital asset.

*Patrick,* the companion case to *Gilmore,* also involved a divorce proceeding and the deductibility of litigation costs. Those costs, however, were incurred in negotiating a property settlement agreement, which divided up ownership of the family business. The parties agreed that only one-sixth of the total legal cost went to the divorce itself, the rest to the financial arrangements. The Fourth Circuit concurred, ruling that the bulk of the expense was properly allocated as a deductible "ordinary and necessary" business expense, pursuant to section 212(2) of the 1954 Code. *Patrick v. United States,* 288 F.2d 292 (4th Cir. 1961).

Again, the Supreme Court reversed, ruling that the case was indistinguishable from *Gilmore.* The fact that certain expenses actually were paid to transfer stock and rearrange property interests was not controlling. The expenses all flowed from claims arising out of the marital relationship, and thus were attributable to that relationship and were not deductible. *Patrick,* 372 U.S. at 57, 83 S.Ct. at 621.

In both *Patrick* and *Gilmore,* because the Court attributed the expenses to a purely personal transaction, the characterization of those expenses presented no problem. If the costs had been attributable to a business transaction, it would have been necessary to determine if the costs represented deductible expenses or adjustments to the cost of a capital asset.

A significant expansion of *Gilmore* and *Patrick* occurred in *Woodward v. Commissioner,* 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970), and its companion case, *United States v. Hilton Hotels Corp.,* 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970).

*Woodward* involved the attribution of various expenses incurred by shareholders in an appraisal action. The taxpayers were majority holders of an Iowa corporation, where state law allows shareholders to vote on a perpetual extension of corporate charter. But if the approval is not unanimous, the dissenting minority holders must be allowed to sell their shares for "real value." In *Woodward,* the dissenting minority and the majority could not agree on "real value." The majority holders brought an appraisal action. Following resolution of the "real value" issue, the majority holders sought to deduct the cost of the appraisal as an "ordinary and necessary" business expense. The Eighth Circuit disagreed, and disallowed the deduction. *Woodward v. Commissioner,* 410 F.2d 313 (8th Cir. 1969). The Supreme Court affirmed.

The basis of the taxpayers' argument was that their "primary purpose" in expending the funds was to allow their business to continue. They noted that the appraisal action did not involve any title issues, only the value of the shares.

The Supreme Court rejected the "primary purpose" test. "A test based on the taxpayer's 'purpose' in undertaking or defending ... litigation would encourage resort to formalisms and artificial distinctions." *Woodward,* 397 U.S. at 577, 90 S.Ct. at 1306. Instead, the Court applied the "origin of the claim" test as established in *Gilmore. Woodward,* 397 U.S. at 578, 90 S.Ct. at 1306. The establishment of a price being a crucial part of a purchase of assets, the Court determined that the appraisal action originated in the efforts to buy the stock, thus, the appraisal costs were attributed to the stock purchase. As the purchase of stock was a capital transaction for tax purposes, the cost of the appraisal was characterized

as a part of the cost of the stock acquired. It was treated as an adjustment to basis, not a deductible expense. *Id.* at 578–79, 90 S.Ct. at 1306–07.

The companion case, *Hilton Hotels,* involved the cost of an appraisal arising from dissenters' rights in a merger. The taxpayer tried to distinguish *Woodward* on the ground that title to the stock passed prior to a value being fixed. The Court saw no distinction, and applied the same reasoning as in *Woodward. Hilton Hotels,* 397 U.S. at 583–85, 90 S.Ct. at 1308–09.

Following *Woodward* and *Hilton,* this court has explicitly applied the origin test on several occasions.[3] In *Redwood Empire Savings & Loan Association v. Commissioner,* 628 F.2d 516 (9th Cir. 1980), for instance, we applied the origin test to determine if defense and settlement costs were deductible. We identified the origin of the suit to be a sale of land, and thus characterized the expenditures in the subsequent fraud suit as nondeductible costs going to the price of land. *Id.* at 520–21. *See also Madden v. Commissioner,* 514 F.2d 1149, 1151–52 (9th Cir. 1975), *cert. denied,* 424 U.S. 912, 96 S.Ct. 1108, 47 L.Ed.2d 316 (1976); *DeMink v. United States,* 448 F.2d 867, 869 (9th Cir. 1971).

### C. *The Tax Court's Analysis*

The Tax Court's opinion identifies the "origin of the claim" test as controlling and notes the Supreme Court's rejection of the "primary purpose" test. *Keller v. Commissioner,* at 1459–60. The Court then discuss-

es the "criteria" to be used to determine the origin of the claim. It quotes, at page 1460, a restatement of the origin test from a prior Tax Court decision, *Boagni v. Commissioner,* 59 T.C. 708 (1973), which states that discovery of the origin requires consideration of "the issues involved, the nature and *objectives* of the litigation, the defenses asserted, the *purpose* for which the claimed deductions were expended, the background of the litigation, and all facts pertaining to the controversy." *Id.* at 713 (emphasis added).

As the emphasis indicates, *Boagni* does not accurately state the origin test. In fact, the criteria listed would be more appropriate for determining the primary purpose of the litigation. This is inconsistent with the Supreme Court's rejection of the purpose test, and it reflects an improper merging of the attribution step with the ultimate characterization decision.

The Tax Court, using the *Boagni* criteria, applied what it called the origin of the claim test, and decided that the origin of Keller's tax action was "in the minority stockholder's claim for rescission." *Keller v. Commissioner,* at 1461.

The Tax Court's application of the origin test was incorrect in two regards. First, a careful reading of *Gilmore* indicates that the "claim" at issue (the origin of which is to be identified) is not the tax claim, but the underlying claim that gave rise to the incurring of expense or income. "[T]he deductibility of these [litigation] expenses turns . . . not upon the *consequences* to

---

**3.** Numerous opinions in other circuits apply the origin rule under many varied circumstances: *McDonald v. Comm'r,* 592 F.2d 635 (2d Cir. 1978) (expense in will contest based on personal right under will, no deduction); *Newark Morning Ledger Co. v. United States,* 539 F.2d 929 (3rd Cir. 1976) (derivative suit not based on concurrent sale of corporation, but rather on management fraud in operation of corporation, cost of suit deductible); *Estate of Baier v. Comm'r,* 533 F.2d 117 (3rd Cir. 1976) (determination of rights under a patent originated in disposition of capital asset, nondeductible); *Brown v. United States,* 526 F.2d 135 (6th Cir. 1975) (valuation costs originated in negotiations to sell stock, not deductible); *Kimbell v. United States,* 490 F.2d 203 (5th Cir.), *cert.*

*denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974) (payment in satisfaction of liability arising from fraudulent sale of capital asset, not deductible); *Clark Oil and Refining Corp. v. United States,* 473 F.2d 1217 (7th Cir. 1973) (amount paid to landowner to settle nuisance action not deductible, as origin of dispute was an attempt to acquire the property); *Anchor Coupling Co. v. United States,* 427 F.2d 429 (7th Cir. 1970), *cert. denied,* 401 U.S. 908, 91 S.Ct. 866, 28 L.Ed.2d 806 (1971) (settlement payment in suit based on breach of contract to sell corporation was a nondeductible capital expenditure); *Helgerson v. United States,* 426 F.2d 1293 (8th Cir. 1970) (expenses arising from litigation following sale of stock originated in the sale, and are not deductible).

respondent of a failure to defeat his wife's community property claims but upon the *origin* and *nature* of the claims themselves." *Gilmore,* 372 U.S. at 43–44, 83 S.Ct. at 626 (emphasis in original).

Thus, the Court stated that the tax character of the legal expenses turns on the origin and nature of the "wife's community property claims." *Id.* In the instant case, the Tax Court examined the wrong claim. The claim to be studied is the claim that gave rise to the transaction that created the tax problem. The proper inquiry, then, is to the origin of the dissident shareholders' claim for rescission. Clearly that claim originated in the sale of the brewery.

The second error in the Tax Court's identification of the "minority stockholder's claim for rescission" as the origin of "[Keller's] legal action," is that the court, as intimated earlier, applied the *Boagni* criteria and looked to the minority's objectives in filing the suit, rather than to the event that prompted them to sue.

If the Supreme Court had applied that analysis in *Gilmore,* the wife's objectives, *i.e.* to get control of the husband's corporations, would have been determinative. Instead, the Court rejected exactly that argument, 372 U.S. at 42, 44, 83 S.Ct. at 625, 626, and ruled that the tax treatment is found in the origin of the suit, not its possible consequences. *Id.* at 43–44, 83 S.Ct. at 626. In the present case, rescission is a consequence.

The Tax Court rejected the sale of the brewery as the origin of the claim. It stated that "[t]he mere fact that the sale . . . was first in the chain of events which led to the litigation is not controlling . . . ." *Keller v. Commissioner,* at 1461. It cites *Gilmore*'s comments that the object of the origin test is to find that transaction from which the taxable event "proximately resulted." *Gilmore,* 372 U.S. at 47, 83 S.Ct. at 628, *quoting Kornhauser v. United States,* 276 U.S. 145, 153, 48 S.Ct. 219, 220, 72 L.Ed. 505 (1928).

The Tax Court was correct in noting that the mere fact that the brewery sale was first in the chain of events leading to the tax dispute is not controlling. It is instead the fact that the brewery sale was the basis of the shareholders' derivative suit, which led to the tax dispute, that is controlling.

In short, a proper application of the origin test leads to the conclusion that the origin of the claim that gave rise to Keller's tax dispute was the June 1958 sale of the brewery.

## D. Characterizing the $2,432,175.45 Payment

Having decided that the payment at issue here was a result of the sale of the brewery, that is, the sale of capital assets, we must next see how the payment fits into the tax treatment of capital transactions.

The Tax Court stated that because the final judgment in state court was the product of a settlement, the next step was to "analyze the nexus between the origin of the claim settled and the basis upon which the settlement was reached." *Keller v. Commissioner,* at 1461. After examining the state court's judgment in some detail, the Tax Court concluded that the nexus in question "is that of a claim for rescission with the $2,432,175.45 payment made as a direct result of the rescission." *Id.* at 1462.

It would seem that under this analysis the Tax Court was unable to determine the tax character of the $2,432,175.45 payment until it decided that the state court's designation of the payment as a substitute for product or profit is controlling. The payment was thereby characterized as ordinary income, and one is left to wonder why the "nexus" analysis was even used.

We believe the proper approach is first to determine the nature of the event or transaction that is the origin of the claim. Here, having determined that the sale of the brewery assets was the origin, we identified the nature of the sale as that of a capital transaction. Because identifying the origin of the claim as a capital transaction does not automatically resolve the tax treatment

of the payment at issue,[4] we must next examine how the payment fits into the structure of a capital transaction.

The state court stated that it was awarding the $2,432,175.45 to compensate Keller for the fact that Maier had held the assets and had benefited from their earning power during the ten years of litigation. The manner in which the amount was determined, *i.e.* by applying an interest rate to the value of the assets, is consistent with that explanation. Thus, we conclude that the $2,432,175.45 is analogous either to interest paid to a seller to compensate for delay in the payment of a purchase price, or to rent paid for the temporary use of income producing property.

As both these analogous situations involve compensation that is taxable as ordinary income,[5] we must ultimately conclude, therefore, that the $2,432,175.45 payment is akin to interest or rent, and hence is taxable to Keller as ordinary income.

IV

CONCLUSION

Although we do not agree with the analysis of the Tax Court as to the attribution inquiry and the ultimate characterization question, we do agree with the result, that the $2,432,175.45 payment to Keller is akin to interest or rent, and therefore is taxable as ordinary income. For the reasons we have stated, therefore, we affirm the judgment of the Tax Court.

AFFIRMED.

---

**4.** Contrast, for example, a situation where an expense originates from an inherently personal event, or where a business outlay originated from an employment relationship. Both of these costs could be characterized simply on the nature of the originating event.

**5.** The Supreme Court, in *Kieselbach v. Comm'r,* 317 U.S. 399, 63 S.Ct. 303, 87 L.Ed. 358 (1943), explained that interest awarded in a condemna-

tion proceeding was "indemnification for delay, not a part of the sale price." *Id.* at 404, 63 S.Ct. at 305–06. In *Comm'r v. Gillette Motor Transport, Inc.,* 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960), the Court held that a payment to compensate the asset owner for a period when the government took possession of the assets under its war powers, was analogous to rent, and hence, was ordinary income.