DUANE STRANAHAN, JR. and CECILY S. STRANAHAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stranahan v. Commissioner
Docket No. 1147-80.
United States Tax Court
T.C. Memo 1982-151; 1982 Tax Ct. Memo LEXIS 592; 43 T.C.M. (CCH) 883; T.C.M. (RIA) 82151; March 25, 1982. Louise A. Jackson, for the petitioners. Kristine A. Roth, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Tax Year Ended
Deficiency
1975
$ 2,584
1976
3,345
Petitioners claim an overpayment of "minimum tax" under section 56(a) [1] in the amount of $ 61,031. The sole issue for decision attributable to the asserted deficiencies is the deductibility under section 212 of certain aircraft rental expenditures incurred by petitioner Duane Stranahan, Jr. in order to attend board meetings and shareholder meetings of a corporation in which he held a substantial minority block of stock. After the filing of the petition in this case, petitioners filed an amended return for the year 1976 in which they sought a refund of the $ 61,031 they paid for the tax imposed by section *594 56(a). Respondent rejected this claim for refund. By proper amendments to the pleadings, the parties now bring before the Court the following additional issues for decision: 1) whether the tax imposed by section 56(a), the "minimum tax," is unconstitutional because it is not an income tax but rather is a direct tax not apportioned among the several states or in proportion to the census in violation of the Sixteenth Amendment, Article I, section 2, clause 3 and Article I, section 9, clause 4, of the Constitution; 2) whether the minimum tax as applied to petitioners violates the Due Process and Just Compensation Clauses of the Fifth Amendment; and 3) whether, if the minimum tax is held constitutional, petitioners are entitled to deduct such tax as an excise tax under section 162 or section 212. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation together with the exhibits attached thereto is incorporated herein by reference. Petitioners Duane Stranahan, Jr. ("Stranahan") and Cecily S. Stranahan, husband and wife, resided at Perrysburg, Ohio, at the time they filed the petition in this case. They timely filed joint income tax returns *595 for the taxable years 1975 and 1976. Petitioners' principal sources of income in 1975 and 1976 were investment income from domestic and foreign securities, income from partnership oil and gas exploration and development activities and income from Stranahan's law practice. Between 1964 and 1973, Stranahan, in gradual amounts, invested over $ 2 million in the American Aviation Corporation, a struggling company in the light or very small airplane business (primarily single-engine airplanes) located in Cleveland, Ohio. This investment represented between 10 and 20 percent of petitioner's assets during the years in question. In 1973, the Grumman Corporation ("Grumman"), a New York corporation engaged primarily in the military aircraft business, transferred a corporate business jet, an agricultural airplane and substantial manufacturing facilities to the American Aviation Corporation in exchange for 80 percent of the latter corporation's stock. At the same time, the name of American Aviation Corporation was changed to GrummanAmerican Aviation Corporation ("GAAC"). As a result of these transactions, Stranahan was left with a roughly four percent stock interest in GAAC, plus warrants *596 to acquire a proportionate amount of additional shares five years later at $ 1 per share. Prior to this combination, Stranahan had been a member of the Executive Committee of American Aviation Corporation. In the first year after the merger, he was invited to attend directors meetings of GAAC as a guest. In 1974, Stranahan was elected a director of GAAC. He remained an uncompensated director in 1975 and 1976, the years before the Court, and served in that capacity on the Audit Committee of the Board. During 1975 and 1976, Stranahan at various times rented a small plane at the rate of $ 100 per hour to fly to meetings where GAAC business was discussed. These meetings were either meetings of the Board of Directors of GAAC, meetings with other minority directors and shareholders immediately prior to Board of Directors meetings or meetings with corporate officers of GAAC. The subject matter of each of these meetings included reviewing operating reports, budgets, financial statements and the routine administerial matters with which directors customarily deal. But the principal problem of these meetings was the ongoing disagreement between the minority shareholders and directors *597 of GAAC and the Grumman-sponsored directors of GAAC over how the company should be run. It was the minority's position that Grumman was operating GAAC like a division and that, as a result, the minority's stock was in danger of losing its considerable value. In particular, the minority shareholders, including Stranahan, complained that Grumman 1) was charging excessive management fees to GAAC, 2) was causing GAAC to pay unnecessary distributor's fees to Page Airways in connection with the sale of GAAC planes and 3) was neglecting business opportunities of GAAC. Through his attendance at these various meetings in 1975 and 1976, Stranahan attempted to alter this state of affairs. Ultimately, in 1978, the minority shareholders as well as Grumman itself disposed of all the stock of GAAC to a third party. On this sale of GAAC stock in 1978, Stranahan realized gain in the amount of roughly $ 1 million. Stranahan never asked for, nor did he receive, reimbursement from GAAC for the cost of the above-mentioned airplane rentals. GAAC paid no dividends to its shareholders in 1975 or 1976. The respondent disallowed deductions for aircraft rental expenditures to fly to the meetings *598 described above in the amounts of $ 3,883 and $ 5,166 in 1975 and 1976, respectively. The respondent allowed deductions for aircraft rental expenditures of $ 4,367 and $ 2,526 for the years 1975 and 1976, respectively, relating to 16 other trips taken by Stranahan in those years. These meetings were as follows: Date
Purpose
January 10, 1975
Attend Michigan Council Trout
Unlimited (C)
February 14, 1975
Meeting H. G. Davis, D. Linder,
D. Stranahan re: Stock Investment
Advisors
April 18, 1975 -
Meeting O. B. Mobley, Jr.,
April 20, 1975
D. Linder, S. Stranahan,
M. Stranahan, re: Hydro Carbon
Limited Partnerships
June 19, 1975 -
Hearing at Court of Appeals for
June 20, 1975
Sixth Circuit, J. Mattimoe,
R. Kelsey
July 22, 1975
Meeting H. G. Davis, D. Stranahan,
re: Stock Advisor
September 3, 1975 -
Meeting O. B. Mobley, S. S. Stranahan,
September 5, 1975
R. Krechman, R. Kronbach, re: Hydro Carbon Financial Records
October 8, 1975
Meeting with Elasta-Turf Rep.,
re: Tennis Court Surface with
Dean Bailey, K. Bailey
October 17, 1975
Meeting with Wadsworth, S. Stranahan,
C. Stranahan, re: Restructuring
Family Charitable Activities (C)
November 10, 1975
Meeting Cincinnati Floor Rep.,
re: Paddle Tennis Courts Shadow
Valley Development Corporation
with Dean Bailey
November 20, 1975 -
Cleveland Bar Association Tax
November 21, 1975
Institute, P. McKenzie, Sam Young,
R. Krechman
February 4, 1976
Meeting O. B. Mobley, Jr., and
R. Kronbach, re: Improved productions
and financial reports
February 13, 1976
Family money management meeting.
April 20, 1976 -
Interviews with potential security
April 22, 1976
investment advisors, Morgan
Guaranty, Neuberger & Berman,
F. Eberstadt & Co. and Templeton
& Debrow
May 4, 1976
Preparation for Appellate review
of charitable deduction, S. R. Young
P. R. McKenzie, N. Miles, A. Wiedeman
September 30, 1976
Ohio Council of Foundation panel
member, re: Private Foundations
November 11, 1976 -
Cleveland Tax Institute with MMBB
November 14, 1976
representatives
*599 At sometime during 1975 or 1976, Stranahan made trips to New York City to confer with an investment banker regarding the possibility of finding an "industrial minority" to replace the existing minority stockholders. [2]
OPINION Issue 1. Aircraft Rental Expenses
The first issue for decision is the deductibility under section 212(2)[3] of aircraft rental expenses incurred by Stranahan in 1975 and 1976 for the purpose of flying to meetings of the Board of Directors of GAAC, meetings with other minority directors and shareholders and meetings with officers of GAAC. Petitioners assert that the above expenses were ordinary and necessary expenditures *600 made to protect the value of Stranahan's substantial investment in GAAC -- that without these expenditures the majority shareholder, Grumman, would have seriously jeopardized the value of the holdings of the minority shareholders. Respondent, on the other hand, argues that the expenses are not deductible under section 212(2) because 1) the expenses did not advance an income-producing motive, 2) as a fiduciary of the company, Stranahan was conducting corporate rather than personal business, 3) the reasonableness of each expenditure was not shown and 4) the variety and number of meetings were not shown to be ordinary and necessary to protect the interests of a minority shareholder. [4]
Notwithstanding respondent's reliance upon the above four arguments, he places most of his emphasis on the contention that Stranahan was conducting corporate rather than personal business, thereby converting *601 his expenditures from personally deductible expenses to contributions to the corporation. Inherent in respondent's position on this point, however, is the thought that involvement in corporate affairs through board membership fatally taints, insofar as section 212(2) deductions are concerned, activities otherwise acceptable in connection with the management, conservation or maintenance of property held for the production of income. As stated in our findings of fact, Stranahan's roughly $ 2 million investment in GAAC represented only 10 to 20 percent of his assets. This, plus the nature of many of the trips for which respondent did in fact allow deductions, reflect the substantiality of Stranahan's investments and his activities related thereto. Stranahan's GAAC role, in other words, was only one of a multi-faceted business and investment activity conducted by Stranahan during the years in question. As we have said in a different factual context, "[t]he line of demarcation between currently deductible and capital expenditures is often a shadowy one * * *." Boagni v. Commissioner,59 T.C. 708, 712 (1973). *602 The facts before us amply demonstrate, when laid side-by-side with those of other cases in a similar context, that we are in he realm of nuance when we search for the line of demarcation. For example, in Nichols v. Commissioner,T.C. Memo. 1963-148, we held against a taxpayer who incurred and sought to deduct substantial travel and other expenses in connection with a corporation which he, his wife and his daughter substantially owned. The facts relied upon by the Court in reaching its conclusion made it abundantly clear that the taxpayer had inextricably interwoven the corporation's overall affairs with his own. We did not find any ground for allowance of the deductions by reason of taxpayer's activities as a director, nor did we accept his fall-back position that he should be allowed some deduction under section 212(2). The expenditures incurred essentially benefited the corporation, not the taxpayer. By way of contrast, the facts of this case convince us that what Stranahan was in fact engaged in was damage control -- a fight for the life of his investment. ( Treas. Reg. Section 1.212-1(b) *603 allows a deduction "even though the property is held merely to minimize a loss with respect thereto.") Stranahan testified that at one point Grumman offered the GAAC minority shareholders $ 4 per share for their stock. Later Grumman attempted a "freeze-out" merger at $ 5 per share. That Stranahan was ultimately able to realize $ 8.50 per share for his stock, amounting to a net profit of about $ 1 million, is eloquent testimony to the success of his efforts. [5] Unless we were willing to conclude (which we are not), that the words of section 212(2) have been totally sapped of their vitality, the facts before us present a convincing case that Stranahan's expenditures were incurred for the management, conservation, or maintenance of his property held by him for the production of income. Thus, we find that petitioners have amply rebutted respondent's disallowance based upon the propositions that the expenses did not advance an income-producing motive and were corporate rather than personal. *604 With regard to point 3 of respondent's basis for disallowance, he asserts on brief merely that "[t]he reasonableness of the expenses with respect to the choice of mode of transportation was also not shown," without further elaboration. Since respondent makes no further mention of this point, and in fact allowed expenses for exactly the same mode of transportation related to Stranahan's other business, investment and charitable activities, we conclude that the expenditures in question were reasonable. We turn now to the question of whether the claimed expenses were "ordinary and necessary" within the intendment of section 1.212-1(d) of the Regulations. [6] As the Second Circuit Court of Appeals pointed out in Low v. Nunan (Commissioner),154 F.2d 261 (2d Cir. 1946), affg. a Memorandum Opinion of this Court, section 212(2) must be read in light of Deputy v. du Pont,308 U.S. 488 (1940). There, the Supreme Court held that there may be deducted as "ordinary" only what can be placed in the category of those items of expenses which a substantial stockholder in a corporation engaged in conserving and enhancing his estate would ordinarily incur. *605 In Low, the taxpayer involved himself extensively in the affairs of a corporation formed for the purpose of facilitating the settlement of the substantial estate of his parents. The taxpayer and his wife lived on real estate owned by the corporation and incurred a number of miscellaneous unreimbursed costs in connection with the corporation. The Circuit Court held that "[s]tockholders -- and especially those who, like the Lows, own considerably less than all of the stock of a corporation -- when engaged in management, conservation or maintenance of their property in that stock, do not ordinarily incur or pay expenses such as those claimed to be deductible here." Id. *606 at 264. It seems clear that the analogy which the Court in Low had in mind was the situation of a minority stockholder of a major listed corporation such as, for example, AT&T. Clearly, such a stockholder would not ordinarily incur unreimbursed expenses for telephone calls, travel, entertainment, etc. on behalf of AT&T in connection with maintaining his stock position. More appropriate for deduction in such a case, as the court pointed out, would be such items as rental of safe deposit boxes, cost of investment counsel, investment and secretarial services, etc. But that is not our case. Unlike the taxpayer in Low v. Nunan, Stranahan did not confuse his corporation's affairs with his own, but to the contrary, simply acted consistently and effectively to forestall Grumman's concerted efforts to denigrate his investment. Stranahan testified that he understood that Grumman "was charging a million dollars a year for their management services and we thought that was too high, and we didn't want to charge anything [as directors' fees, reimbursement for expenses, etc.] to make the point." While it may be perfectly true that Stranahan acted not alone but in concert with *607 other substantial minority stockholders, their joint efforts were essentially directed toward the protection of their respective investments. Thus it cannot be convincingly argued that Stranahan's expenditures benefited others and only peripherally himself. As indicated above, the concerted efforts of Stranahan and his fellow minority stockholders to preserve their investment in GAAC was ultimately successful. We think these efforts, including Stranahan's, were obviously necessary, and since they were what any investor similar situated might reasonably have done, they were "ordinary." "The situation [may be] unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part." Welch v. Helvering,290 U.S. 111, 114 (1933). Accordingly, we hold for petitioners on this issue. Issue 2. Minimum Tax
The second issue involves both the constitutionality and the deductibility of the minimum tax. On their 1976 returns, petitioners paid $ 61,031 attributable to the tax imposed by section 56(a), the minimum tax. Petitioners' items of tax preference for purposes of the minimum tax amounted to $ 528,605, composed *608 of $ 63,971 of depletion, $ 195,386 of capital gain and $ 269,248 of intangible drilling costs. Petitioners now seek a refund of the minimum tax they paid on the following grounds: 1) the minimum tax is a direct tax not apportioned among the states or in proportion to the census in violation of the Sixteenth Amendment, Artice I, section 2, clause 3, and Article I, section 9, clause 4 of the Constitution; 2) the minimum tax as applied to petitioners violates the Due Process and Just Compensation Clauses of the Fifth Amendment; and 3) the minimum tax, if constitutional, is a deductible excise tax under either section 162 or section 212. In Graff v. Commissioner,74 T.C. 743, 765-767 (1980), we held that the minimum tax was an income tax, not subject to the requirement of apportionment among the states or by the census by virtue of the Sixteenth Amendment. See also Wyly v. United States,662 F.2d 397 (5th Cir. 1981), affg. an unreported district court opinion ( N.D. Tex. 1980, 46 AFTR2d 80-5892, 80-2 USTC par. 9645). This holding accords with *609 the implicit assumption to the same effect of such cases as United States v. Darusmont,449 U.S. 292 (1981), a per curiam reversal of an unreported district court opinion ( E.D. Cal. 1980, 46 AFTR2d 80-5805, 80-2 USTC par. 9671); Estate of Kearns v. Commissioner,73 T.C. 1223 (1980); and Buttke v. Commissioner,72 T.C. 677 (1979), affd. per curiam 625 F.2d 202 (8th Cir. 1980), to name only a few. Petitioners attempt to distinguish these prior cases on the grounds that they focused primarily on the capital gain item of tax preference when concluding that the minimum tax merely adjusted the rate of income tax on net gain measured elsewhere in the Code. Petitioners argue that items of tax preference such as excess intangible drilling costs under section 263(c) (i.e., those exceeding straight line capitalized intangible drilling costs) and excess percentage depletion deductions (i.e., those exceeding the taxpayer's adjusted basis in the assets) are really items of capital recovery and to impose a tax on these items would be to impose an impermissible direct tax on cost basis recovery deductions, not merely *610 to adjust tax rates on net gain already constitutionally measured. See Burke, "Graff,Revenue Ruling 78-61 And Inland Steel Company: What Is The Add-On Minimum Tax?," 59 TAXES 161 (1981). We see no merit whatsoever in this argument as regards the preference item for percentage depletion deductions taken exceeding the taxpayer's basis in the property. As to this item, other provisions of the Internal Revenue Code still allow a taxpayer a complete nontaxable recovery of his cost basis in the property. Only depletion deductions in excess of cost basis are subjected to the minimum tax. However, we do, at least initially, see some merit in petitioners' argument as regards the intangible drilling cost tax preference item. The intangible drilling cost deduction of section 263(c) provides an elective method of accelerating the recovery of actual cost (normally recoverable by capitalization and amortization). A taxpayer electing to take the section 263(c) deduction may be subject *611 to an additional minimum tax on part of this actual cost basis recovery deduction -- i.e., the part of his actual cost deduction which exceeds the deduction he would have been able to take in the taxable year in which taken had he capitalized and amortized the expenditures. At first blush, then, the section 56(a) tax appears to impose an impermissible direct tax on part of the recovery of the taxpayer's capital. See Burnet v. Logan,283 U.S. 404 (1931); Southern Pacific Co. v. Lowe,247 U.S. 330 (1918). However, the section 56(a) tax on intangible drilling costs is, in effect, an elective tax, incurred only if the taxpayer chooses under section 263(c) to forgo the normal method of cost recovery (i.e., capitalization and amortization). This normal method allows for a complete, non-taxable recovery of the taxpayer's capital investment. Such a tax as section 56(a), which is imposed only on taxpayers who in essence elect to have it imposed by their own actions in taking certain preferential deductions, is simply not a direct tax prohibited by the Constitution. Not being a direct tax, it need not be apportioned among the states or in accordance with *612 the census to be constitutional. Having reaffirmed our position that the minimum tax is constitutional because it is not a direct tax (whether or not it is truly an income tax for purposes of constitutional analysis) we next proceed to petitioners' Due Process and Just Compensation Clause arguments. Petitioners apparently have abandoned their Just Compensation Clause argument for we can find no reference to it in their briefs. Consequently, we do not deal with it here. As to the Due Process Clause argument, petitioners contend that the retroactive application of the 1976 amendment which made intangible drilling costs a new item of tax preference [4] for purposes of the minimum tax violated due process as applied to petitioners. In Darusmont,supra, the Supreme Court held that retroactive application of an increased rate of minimum tax to capital gains preference items did not violate due process when the amendment increasing the rate of tax was passed after the transactions producing the gain were completed. We have no evidence in this record as to what transactions *613 gave rise to petitioners' $ 269,248 of intangible drilling cost preference items in 1976. For all we know, the transactions giving rise to these preference items may have been completed after the October 4, 1976, date of the passage of the amendment. In such a case the amendment would not apply retroactively as to petitioners. On this record we can certainly find no violation of the Due Process Clause. Petitioners' final argument is that the minimum tax is an excise tax, and is therefore deductible by them under section 162 or section 212. We have recently held that the minimum tax is not a deductible tax. Standard Oil Co. (Indiana) v. Commissioner,77 T.C. 349, 411-412 (1981) on appeal (7th Cir., March 1, 1982). Accord Wyly v. United States,supra at 406. We see no reason *614 to reexamine that holding here. Accordingly, petitioners have not made an overpayment of minimum tax. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 in effect during the years before the Court, unless otherwise indicated.↩
2. The record is not clear as to whether these trips were included among those for which respondent allowed deductions.↩
3. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (2) for the management, conservation, or maintenance of property held for the production of income; * * *.↩
4. We would observe that respondent has not attempted to invoke the so-called "defense of title" regulations; i.e., sec. 1.212-1(k), Income Tax Regs. Cf. Cruttenden v. Commissioner,70 T.C. 191 (1978), affd. 644 F.2d 1368↩ (9th Cir. 1981).
5. The term "income" in section 212
includes not merely income of the taxable year but also income which the taxpayer * * * may realize in subsequent taxable years; and is not confined to recurring income but applies as well to gains from the disposition of property. [Section 1.212-1(b), Income Tax Regs.↩]
6. Section 1.212-1(d), Income Tax Regs., provides: (d) Expenses, to be deductible under section 212↩, must be "ordinary and necessary". Thus, such expenses must be reasonable in amount and must bear a reasonable and proximate relation to the production or collection of taxable income or to the management, conservation, or maintenance of property held for the production of income.
4. Tax Reform act of 1976, Pub. L. No. 94-455, sec. 301(c)(1)(B), 90 Stat. 1550. The amendment, passed October 4, 1976, was made applicable to all items of tax preference for taxable years beginning after December 31, 1975. Id.,↩ sec. 301(g)(1), 90 Stat. 1553.