John P. **McKEAGUE** and Constance F. **McKeague, Plaintiffs,**

v.

The **UNITED STATES, Defendant.**

No. 90–84T.

United States Claims Court.

July 1, 1987.

David A. Haist, Fort Wayne, Ind., for plaintiffs.

Stella A. Gieseler and Mildred L. Seidman, Washington, D.C., with whom was Asst. Atty. Gen., Roger M. Olsen, for defendant.

## OPINION

MOODY R. TIDWELL, III, District Judge:

This action is again before the court because the parties were unable to agree upon a joint stipulation as ordered by this court. A determination is sought as to a proper basis from which attorney fees may be allocated after a previous finding that the claims involved in the action originated from both ordinary and capital transactions.

## FACTS

This case grows out of a bitter dispute between plaintiff, Mr. John McKeague (McKeague) and the company of which he was an employee, officer, director, and stockholder, F.W. Dwyer Manufacturing Co., Inc. and its successor, Dwyers Instruments, Inc. (DII). Plaintiff Constance McKeague is a party only because she was party to a joint return.

In 1969, DII was recapitalized because James Dwyer, the president and majority stock holder, wanted to assure that the company would continue operation after his

anticipated retirement in ten years. The recapitalization plan provided for equal control of the company by McKeague and another employee, Edwin Clark, after Dwyer's retirement.

In the recapitalization, DII sold an equal number of shares to McKeague and Clark at book value, with the result of each owning 28% of the stock and Dwyer holding 30%. Subsequently, a portion of McKeague's and Clark's stock was placed in a voting trust of which Dwyer was the voting trustee. Dwyer, however, was required under the provisions of the voting trust to guarantee that McKeague and Clark would be minority directors of DII.

McKeague, Dwyer and Clark also entered into a stock restriction agreement which required each of them to offer stock in the company to the company and each other before disposing it to outsiders. The agreement provided that, with the exception of death, there was no right to demand the purchase of another stockholder's shares. In addition, the bylaws of DII were amended to require unanimous approval of the directors for the issuance or public sale of any stock in order to prevent substantial diminution of the control of the three individuals.

On March 20, 1969, McKeague entered into a ten year written employment contract with DII. This contract provided that McKeague was to be employed in an executive capacity and that he was to have broad planning responsibility and policy authority. Dwyer became chief executive officer, McKeague became vice president of operations and Clark took over the position of vice president of engineering and sales. McKeague and Clark were each guaranteed a minimum salary of $40,000 a year plus bonuses based on sales volume. Between 1969 and 1974, there were frequent disagreements between McKeague and Clark. In November 1974, Dwyer appointed Clark president and McKeague administrative vice president in order to solve these problems. In 1976, Clark told McKeague that he was attempting to purchase additional shares from Dwyer and that McKeague would become vice presi-

dent of industrial relations, another step downward, as compared to Clark. Subsequently, the attorney for the company and Dwyer informed McKeague that Dwyer wanted to buy McKeague's stock and remove him from the company.

Following a series of meetings, Dwyer offered to buy out the remaining three years of McKeague's employment contract for $120,000 and all of McKeague's stock for $700,000, approximately 60% of book value. McKeague accepted the offer of the buy-out of his employment contract, but rejected the offer for his stock as inadequate. McKeague's employment was then terminated, but he did continue to receive $40,000 from the company for the next three years, without bonuses. McKeague remained a director.

In the ensuing two years, Dwyer and Clark took various actions that were designed to eliminate McKeague totally from the company. Attempts to reach an agreement for the sale of McKeague's stock were unsuccessful.

In April 1978, McKeague filed suit in the United States District Court for the Northern District of Indiana against Dwyer, Clark and DII. The district court held for McKeague, finding that Dwyer and Clark had engaged in a course of conduct designed to squeeze McKeague out of the company, breached the agreements relating back to the 1969 recapitalization and McKeague's employment contract, and engaged in other improper conduct. The court indicated its proposed judgment. However, prior to the entry of that judgment, the parties settled the suit on substantially the same terms as those in the proposed judgment. McKeague sold his stock to Dwyer and Clark for $3,168,375, received $200,000 for breach of his employment contract, and resigned as director.

In plaintiff's 1979 federal tax return, McKeague deducted $285,418 from his total unreimbursed litigation expenses incurred that year as a miscellaneous itemized deduction. The Commissioner of Internal Revenue ruled that a portion of those expenses were attributable to the disposition of McKeague's stock and there-

fore not deductible as an expense under the Internal Revenue Code of 1954, 26 U.S.C. § 162, 212 (1976). The Commissioner determined that a portion should have been added to McKeague's basis in the stock in determining his capital gain on the sale because the amount McKeague received on the sale of his stock represented 94% of the settlement as a capital expenditure and only the remaining $200,000 received as damages for breach of his employment contract as ordinary expense. The Commissioner assessed a deficiency based upon that allocation.

Plaintiffs paid the taxes and penalties assessed. On February 27, 1984, having satisfied all the prerequisites, plaintiffs brought suit in this court to recover those sums. The case was tried in April 1985. The court entered a judgment for plaintiffs and granted a refund of $167,134.74 and interest as provided by law. The Government appealed the ruling to the United States Court of Appeals for the Federal Circuit, which vacated the judgment and remanded the case for further proceedings.

On remand, the Court held that plaintiff's claim had a dual origin and that the fees should be apportioned according to the amount of time spent on each aspect of the litigation. The parties were unable to agree on a joint stipulation and, upon court order, filed simultaneous briefs addressing the allocation issue.

### DISCUSSION

■ Defendant contended that the only proper allocation would be a pro-rata apportionment based on the resulting settlement award. However, the Supreme Court has stated that the characterization of costs depends on whether or not the claim arises in connection with the taxpayers profit seeking activities and does not depend on consequence or result. *Gilmore v. United States*, 372 U.S. 39, 48, 83 S.Ct. 623, 628–29, 9 L.Ed.2d 570 (1963). Analysis of consequence or result is excluded in determining the origin of a claim. *Keller Street Dev. Co. v. Commissioner*, 688 F.2d 675, 678–79 (9th Cir.1982); *Newark Morning Ledger Co. v. United States*, 416

F.Supp. 689, 698 (D.C.N.J.1975), *aff'd*, 539 F.2d 929 (3d Cir.1976). The origin of the claim doctrine is not a forward looking process. *Lykes v. United States*, 343 U.S. 118, 125–26, 72 S.Ct. 585, 589–90, 96 L.Ed. 791 (1952), *reh. denied*, 343 U.S. 937, 72 S.Ct. 768, 96 L.Ed. 1344. Following the clear mandate that the origin of the claim test rejects an analysis of result or consequence, the court finds defendant's allocation based on the settlement award to be inappropriate.

The Supreme Court further clarified the application of the origin of the claim test by rejecting any analysis of "purpose". *Woodward v. Commissioner*, 397 U.S. 572, 578, 90 S.Ct. 1302, 1306, 25 L.Ed.2d 577 (1970). "A test based on the taxpayers 'purpose' in undertaking or ... defending litigation would encourage a resort to formalisms and artificial distinctions...." *Id.* at 577, 90 S.Ct. at 1306. Testimony pertaining to purpose or motive in instituting a claim is irrelevant in determining the origin of a claim. *Newark*, 416 F.Supp. at 696. Following this reasoning, the court rejects defendant's argument that most of the counts involved in this case were brought solely to achieve the relief granted in Count XIII (the forced buy-out). This reasoning is incorrect, as it looks to the purpose and result of the action, and not to the origin of the claim.

Defendant further argued that the origins of each claim are intertwined between capital and ordinary expenses and may not be separated in characterizing costs. Defendant contends, for example, that evidence prepared for Count V, a count involving access to DII books, was also used to prove Count XIII, the forced buy-out, and therefore requires capital treatment. Such an analysis is forward looking, as it uses the time spent on a count to determine origin, as opposed to first defining the origin of the claim, then characterizing the expense. *Gilmore*, 372 U.S. at 48, 83 S.Ct. at 628–29. The rule that legal expenditures are nondeductible when made in connection with certain capital transactions does not mean that, by pavlovian reflex, they must always be characterized as capi-

tal. *Mitchell v. United States*, 187 Ct.Cl. 342, 350, 408 F.2d 435, 439 (1969). An ordinary expense does not become a capital expenditure simply because of some relation in time or circumstance to an admittedly capital expenditure. *Connecticut Light and Power Co. v. United States*, 156 Ct.Cl. 304, 312, 299 F.2d 259, 264 (1962). Whether the litigation succeeds or fails is not a factor, and whether its result indirectly enhances capital values is not a factor; the only consideration that controls is the nature and origin of the expense. *Newark*, 416 F.Supp. at 689 (1975). Defendant's analysis looks at the means used to attain a certain end, as opposed to looking at the origin of a claim and the actions that arose from it. *Gilmore*, 372 U.S. at 48, 83 S.Ct. at 628–29.

■ The object of the "origin of the claim" test is to find the transaction or activity from which the taxable event approximately resulted, *Gilmore*, 372 U.S. at 47, 83 S.Ct. at 628, or the event that "led to the tax dispute." *Keller*, 688 F.2d at 681. The origin is defined by analyzing the facts and determining what the basis of the transaction is, and does not rely on purpose, consequence or result. *Newark*, 416 F.Supp. at 695; *Keller*, 688 F.2d at 681. When there are multiple claims and origins, the individual counts or claims may be separated and analyzed, *Parker v. United States*, 215 Ct.Cl. 773, 788, 573 F.2d 42, 50 (1978) *cert. denied*, 439 U.S. 1046, 99 S.Ct. 720, 58 L.Ed.2d 704; *Buder v. United States*, 221 F.Supp. 425, 431–32 (D.Mo. 1963), to determine whether the action arose in connection with either plaintiff's business activities or a capital transaction.[1] *See Gilmore*, 372 U.S. at 48, 83 S.Ct. at 628–29.

The original action brought by plaintiff involved 16 individual counts, each constituting a separate cause of action. In determining the origin and nature of the various counts, legal expenses are deductible as business expenses if they are directly related with, or connected to taxpayers' trade or business. I.R.C. § 162 (1982); *Newark*, 416 F.Supp. at 697; *Reed v. Commissioner*, 55 T.C. 32, 42 (1970). Expenditures for the protection of an existing investment or the continuation of an existing business or the preservation of existing income are also ordinary expenses. I.R.C. § 212 (1982); *Briarcliff Candy Corp. v. Commissioner*, 475 F.2d 775, 787 (2d Cir.1973); *Stranahan v. Commissioner*, 43 T.C.M. (CCH) 883 (1982). For a cost to be attributed to a capital expense, however, it must be directly related to the acquisition or disposition of a capital asset. I.R.C. § 263 (1982); *Hilton Hotel v. United States*, 397 U.S. 580, 583, 90 S.Ct. 1307, 1308–09, 25 L.Ed.2d 585 (1970); *Kutz v. United States*, 392 F.Supp. 539, 541 (M.D.Penn.1975); *Reed*, 55 T.C. at 42. In accordance with these guidelines, the origin and nature of each count is determined as follows:

### Counts I–IV

These counts were stipulated by both parties to be ordinary expense items.

### Count V

■ *Injunctive relief: Access to DII's books, records and other information.* Defendant correctly points out that an expense is capital if it directly relates to the acquisition or disposition of property. However, the court finds that plaintiff's seeking access to management information directly related to the protection of existing income or the continuation of an existing business within Sections 162 and 212 of the Internal Revenue Code. *See Briarcliff*, 475 F.2d at 787. Plaintiff was an employee and, at the time in question, a director of a corporation engaged in a trade or business. *Primuth v. Commissioner*, 54 T.C. 374, 377 (1970). Expenses incurred to guarantee income from investment property, as well as carrying out a taxpayer's responsibilities as an investor are deductible.

---

1. This court has previously held that this action had dual origins: to "counter the attempt by Clark and Dwyer to 1) eliminate McKeague as an employee of the company, and 2) acquire his stock at an unreasonably low price. The former aspect of the claim gives rise to an ordinary income deduction and the latter aspect to an increase in the basis of a capital asset." *McKeague v. United States*, 11 Cl.Ct. 342, 345 (1986).

*Mitchell,* 187 Ct.Cl. at 350–52, 408 F.2d at 440–41. As the origin of this claim related to the protection of plaintiff's business interest, the legal expenses incurred for Count V should allow ordinary expense deductions.

### Count VI

■ *Injunction: Failure to hold proper meetings.* Similar to Count V, this injunction had no direct relation to the disposition of stock, but involved the protection of plaintiff's continuing interest in the company. Being informed and involved in board meetings is an important part of effectively managing a business. By not holding proper board meetings, defendant in the district court action, effectively shut plaintiff out from making corporate decisions and exercising any influence over administrative policy. Enforcing proper board meetings is directly related to retaining a business interest and therefore the character of Count VI is ordinary in nature.

### Count VII

■ *Injunctive relief and damages sustained due to breach of recapitalization agreements.* The recapitalization agreement provided for equal control by plaintiff and Clark. The breach of that agreement, as well as the formation of an executive committee, which plaintiff was not a part, directly reduced plaintiff's control over the corporation. Again, defendant directors tried to nullify plaintiff's control over DII. Therefore the origin of this claim relates to plaintiff's employment duties and responsibilities. The breach did not directly relate to the disposition of stock, rather, the control of DII, thus legal fees incurred in protecting plaintiff's right of control were ordinary in nature.

### Count VIII

■ *Payment of additional dividends.* Clark and Dwyer refused to pay plaintiff his full dividends. The action to enforce such payments constitutes the origin of this claim. Dividends are, by definition, ordinary income items under I.R.C. § 301.

Therefore, an action to recover lost dividends is afforded ordinary income treatment.

### Count IX

*Payment of additional dividends.* This count is afforded the same treatment as Count VIII.

### Count X

■ *Injunction: Grant and exercise of stock options.* According to the recapitalization agreements, options were not to be granted without the unanimous vote of the shareholders. The origin of this claim lies in the recapitalization agreement. The options were voted upon and approved without participation by plaintiff, contrary to the agreement. Exercise of the options would have, in effect, further negated plaintiff's control over the company by changing his ownership percentage in DII. An injunction against the granting of stock options directly related to plaintiff's business interest and control over DII.

### Count XI

■ *Injunction: Barred counsel at board and shareholders' meetings.* The attendance of McKeague's counsel at the board meetings would have created an incentive to board members to follow the guidelines set out in formal agreements. It would have provided some measurable degree of assurance against inappropriate activity. Barring of plaintiff's counsel from the board meetings is intertwined with corporate control. Thus, Count XI is an ordinary income expense.

### Count XII

■ *Injunction: Honor proxy.* Proxy statements involve the transfer of a voting right, and do not constitute a constructive or actual loss of stock ownership. As proxies do not involve the disposition of a capital asset, rather, voting privileges, Count XII is considered an ordinary expense.

### Count XIII

This count is stipulated to be a capital expense.

### Count XIV

■ *Reasonable attorney's fees incurred in bringing a suit for lost wages.* This claim originated in the employment suit underlying this action. Wages are an ordinary income item and a suit to recover legal expenses for wages is ordinary in nature. In no way does a suit for lost wages relate to the disposition of a capital asset.

### Count XV

■ *Shareholders' derivative action: Payment to DII of company funds to pay attorney fees of defendant directors.* The litigation expenses incurred by defendant directors and paid for by DII were necessary for the protection of the integrity of DII's management and would be deductible business expenses to DII within Section 162. *Newark Morning Ledger Co. v. United States,* 539 F.2d 929, 933–34 (3d Cir.1976); *Mitchell,* 187 Ct.Cl. at 352, 408 F.2d at 411. The counts involving defendant directors dealt with fraud and breach of fiduciary duty, and not the disposition of stock. This count, then, involves the reimbursement to DII of funds for which they took ordinary deductions and does not relate to DII's acquisition of stock. The character of an expense does not change between causes of action or parties. As the corporation may deduct its legal expenses as ordinary, plaintiffs should also be able to deduct the same in a derivative action.

### Count XVI

■ *Fraud and misrepresentation: Seeking lost compensation, punitive damages and attorney fees.* This count involves three ordinary income items: Lost compensation, punitive damages and attorney fees, all of which originated from the parties' employment dispute. As none of the remedies sought, as well as the claim to fraud, related directly to the disposition of a capital asset, Count XVII is treated as warranting ordinary expense treatment.

### ALLOCATION

Of the 16 counts involved in this case, the court considers only Count XIII to be directly related to the disposition of a capital asset. Using the analysis of attorney hours provided by defendant, the court is able to allocate identified hours to ordinary and capital expenses: 592.50 hours were spent on ordinary expense counts and 294.-50 hours on capital. These hours, however, only account for approximately 29% of the total hours spent on the case.

The remaining hours were not attributed to any specific count. The parties presented conflicting views on how to allocate these remaining hours. Defendant suggested a pro-rata method, based on the hours already defined. Plaintiff proposed following the testimony given by Mr. Gerding, the lead attorney on the original case in the district court, who testified that approximately 15% of his time billed was spent on Count XIII. Defining the correct basis in allocating attorney fees does not require exactness. *See Ditmars v. Commissioner,* 302 F.2d at 488 (2d Cir.1962); *Louisville Provision Co. v. Commissioner,* 1 T.C.M. (CCH) 960 (1943), *aff'd,* 155 F.2d 505 (6th Cir.1946), *cert. denied,* 329 U.S. 788, 67 S.Ct. 356, 91 L.Ed. 675 (1946). The court chooses to allocate the remaining hours according to Mr. Gerding's testimony because it was established by affidavit, was not refuted at trial, and the testimony of lawyers has been used to make allocations similar to the one presently disputed. *See Munn v. United States,* 197 Ct.Cl. 233, 248, 455 F.2d 1028, 1035 (1972); *Ditmars v. Commissioner,* 302 F.2d 481, 488 (2d Cir. 1962).

In sum, a total of 2,475.04 hours will be deemed to have been spent on ordinary counts and 626.71 hours on the capital count. A cost per hour rate of $88.50 is formulated by dividing the total hours billed by the amount of legal expenses incurred. Multiplying that rate by the categorized hours results in initial figures of $219,041.04 of ordinary expenses and $55,-

463.84 of capital. Adding $1,935.00 of accountant fees to ordinary expenses and $9,000.00 of appraiser fees to capital, the final breakdown is:

Ordinary Expenses: $220,976.04

Capital Expenses: $64,463.84

Subtracting $17,124.00 already allowed as a deduction, it is ordered that plaintiff be allowed $203,852.04 of ordinary deductions. The parties are ordered to file a stipulation for entry of judgment within 30 days on the amount that should be refunded to plaintiff. Upon receipt of the stipulation for entry of judgment, the Clerk shall enter judgment accordingly.