**PUTNAM–GREENE FINANCIAL CORP. and First Bank of Coastal Georgia, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 5:02–CV–185–2 (DF).

United States District Court, M.D. Georgia, Macon Division.

Feb. 6, 2004.

J. Littleton Glover, Jr., Mr., Peter A. Durham, Newnan, GA, for Plaintiffs.

Robert D. McCullers, Mr., Macon, GA, Michael N. Wilcove, Mr., Department of Justice, Washington, DC, for Defendant.

## ORDER

FITZPATRICK, District Judge.

During the years 1993, 1994 and 1995, Plaintiffs were involved in a series of legal actions with the minority shareholders of First Bank of Coastal Georgia ("the Bank"). Thereafter, Plaintiffs attempted to deduct the expenses of this litigation from their tax returns during the corresponding years as an ordinary and necessary business expense, pursuant to the deduction allowed under 26 U.S.C.A. § 162(a) (West 2003). However, Plaintiffs were denied these deductions, paid the full amount of taxes due and are now seeking a refund for the amount of taxes overpaid. Currently before the Court is Plaintiffs' Motion for Summary Judgement (tab # 16).

## I. STANDARD OF REVIEW

The Supreme Court has observed, "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under Rule 56, summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©; *see also Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the non-moving party, but the court may not make credibility determinations or weigh the evidence. *See Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. FACTUAL BACKGROUND

Putnam–Greene Financial Corporation ("PGFC") is a holding company. In 1987, PGFC bought, for $3000.00 per share, 53.8% of the outstanding shares of Pembroke State Bank (which later changed its name to First Bank of Coastal Georgia, "the Bank"). The remaining shares of the Bank were held primarily by two families, the Warnells and the Stricklands. For the year and a half following its initial purchase, PGFC attempted to institute major changes in the method of operation and management at the Bank. To compensate for the losses from unperforming loans, PGFC began retaining profits rather than paying substantial dividends, as had been the prior practice. PGFC also sought to change the name of the Bank to reflect a more regional institution. However, PGFC was not able to change the Bank's name, initially, because a super majority vote of the shareholders was needed to approve the change, and PGFC did not control such a majority. PGFC attempted to obtain a super majority in the Bank by conducting a reverse stock split. A reserve stock split would have exchanged every 807 existing shares of Bank stock for one share of stock after the reverse split. PGFC proposed paying $2200.00 per share for the stock. In addition, PGFC had received tentative approval from the State of Georgia Department of Banking and Finance to conduct this reverse split. However, five members of the Warnell family were granted a temporary restraining order ("TRO") that prevented the scheduled shareholder's meeting, where the vote on the reverse stock split was on the agenda, from taking place. Unsuccessfully, PGFC appealed to the Georgia Supreme Court for a reconsideration of the TRO. After this appeal, there is no evidence in the record that there was any further attempt made to conduct a reverse stock split or to hold a shareholder's meeting to consider a reserve stock split.

After the vote on the reverse stock split was thwarted, relations between PGFC and the minority shareholders continued to deteriorate. Ultimately, Plaintiffs were subjected to six suits brought by minority shareholders. The first such suit was the Warnell action to obtain the TRO. Second, four members of the Warnell family, Charles, Frederick, Herbert and Brooks, filed suit in 1990 seeking, in count one, to prevent a shareholder's meeting where the reverse stock split would be considered from occurring, and seeking damages in counts two, three and four. The complaint was later amended to include a fifth count that prayed for punitive damages. A settlement agreement, that was reached in March 1991, included the sale of the plaintiffs' stock to PGFC. However, other parties were added to the suit as plaintiffs in 1992 by the presiding Judge and the first proposed settlement agreement expired. This was followed by a second settlement agreement, whereby PGFC purchased the stock owned by these minority shareholding plaintiffs. Litigation expenses involved in this litigation, referred to as the Charles Warnell action, are at issue in this suit.

After the negotiation of this settlement, three plaintiffs objected and refused to execute the settlement agreement. These plaintiffs included Brooks Warnell, Carolyn Warnell Bryan and Dorothy Warnell, with both Carolyn and Dorothy having been added as plaintiffs by the Judge. In addition, Herbert Warnell later renounced his execution of the settlement agreement. The result was this, the third, action brought by minority shareholders against PGFC. The Georgia Supreme Court affirmed the holding of the trial court, that both Brooks and Herbert Warnell were

bound by the agreement. The suit continued, however, with Carolyn Warnell Bryan and Dorothy Warnell as plaintiffs. Also, Dorothy Warnell challenged the ownership of shares of stock she claimed belonged to her, but were purchased by PGFC from Charles Warnell.

The fourth action PGFC faced from minority shareholders was filed in 1991 by Danny Warnell. However, one week after being removed to the United States District Court for the Southern District of Georgia, and 46 days after initially being filed, the suit was voluntarily dismissed by Danny Warnell. In 1993, Danny Warnell filed a complaint for the recovery of damages (the "Danny Warnell action") in the Superior Court of Bryan County, Georgia, which is the fifth minority shareholder action PGFC defended. An identical complaint to the Danny Warnell action was filed contemporaneously on behalf of the Strickland family, the sixth action brought by minority shareholders against PGFC. Both suits sought money damages for a failure to pay dividends and for Bank mismanagement and were filed as direct and derivative actions. After significant discovery and after a jury had been empaneled to hear the Danny Warnell and Strickland actions, the parties reached a settlement agreement whereby PGFC bought the stock owned by these minority shareholders for $2725.00 per share (the same amount paid the Charles Warnell plaintiffs), paid legal fees and litigation expenses and damages to Danny Warnell and the Stricklands.

PGFC incurred the costs to defend itself against these actions during 1993, 1994 and 1995, and therefore, took the expenses they considered ordinary business expenses as deductions for ordinary business expenses on their corresponding income tax returns. In addition, PGFC deducted the damages, fees, expenses and costs associated with the settlement of these actions. The Internal Revenue Service disallowed these deductions as ordinary business expenses under § 162(a), having determined the expenses were capital in nature and, therefore, must be capitalized under 26 U.S.C.A. § 263 (West 2003). After challenging this decision, PGFC paid the disputed amount not allowed as a deduction and now seeks a determination as to the type of expenses involved, in order to obtain a refund for overpaid taxes.

## III. DISCUSSION

"All ordinary and necessary expenses paid or incurred in carrying on a trade or business" are deductible from a taxpayer's ordinary income under § 162(a), however, capital expenditures may not be deducted from ordinary income but are able to be deducted under § 263 as a capital expenditure when the capital gain is realized. *See Estate of Meade v. CIR,* 489 F.2d 161, 164 (5th Cir.1974).[1] "Whether litigation proceeds are properly characterized as ordinary income or capital income is governed by the origin of the claim test." *Dye v. U.S.,* 121 F.3d 1399, 1404 (10th Cir.1997) (quoting *Woodward v. Commissioner,* 397 U.S. 572, 577, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970)). The Supreme Court has held that the correct inquiry is to examine the "origin and character" of the claim when considering whether litigation expenses are able to be deducted as an ordinary expense or must be capitalized. *See Woodward,* 397 U.S. at 578, 90 S.Ct. 1302. To further clarify the origin of the claim test, in a companion case, the Supreme Court stated, "the ex-

---

1. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

penses of litigation that arise out of the acquisition of a capital asset are capital expenses" regardless of the "taxpayer's purpose in incurring" the litigation expense. *U.S. v. Hilton Hotels Corp.*, 397 U.S. 580, 583, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970). The origin of the claim test aims "to find the transaction or activity from which the taxable event approximately resulted or the event that lead to the tax dispute." *McKeague v. U.S.*, 12 Cl.Ct. 671, 675 (Cl.CT.1987) (quoting *U.S. v. Gilmore*, 372 U.S. 39, 47, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963)).

 Because a test focusing "upon the taxpayer's purpose in undertaking or defending a particular piece of litigation would encourage resort to formalisms and artificial distinctions," the origin of the claim test considers "the origin and character of the claim for which the expenditures were made." *Meade*, 489 F.2d at 165 (quoting *Woodward*, 397 U.S. at 577, 90 S.Ct. 1302). In determining the basis of the transaction, the origin of the claim test does not consider the "purpose" of the claim, as the analysis involved in determining the origin of a claim excludes the "consequence or result" of the litigation. *McKeague*, 12 Cl.Ct. at 674–675. What is critical in making a determination regarding the origin of a claim is undertaking "an objective inquiry into the nature and circumstances of the lawsuit." *King v. U.S.*, 162 F.Supp.2d 750, 753–754 (N.D.Ohio 2001); see also *Boagni v. CIR*, 59 T.C. 708, 714, 1973 WL 2589 (U.S. Tax Ct.1973) (noting that the inquiry to be made is one to ascertain "the kind of transaction out of which the litigation arose"). Furthermore, proximity in time is not determinative, as "an ordinary expense does not become a capital expenditure simply because of some relation in time or circumstance to an admittedly capital expenditure." *McKeague*, 12 Cl.Ct. at 674–675. In addition, "whether the litigation succeeds or fails is not a factor, and whether its result indirectly enhances capital value is not a factor," and therefore, all that should be considered is the "nature and origin of the expense" involved in the litigation at issue. *Id.* at 675.

 In noting that the line of demarcation between deductible and nondeductible expenses is not always clear, "the issues involved, the nature and objectives of the suit in which the expenditures were made, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all facts pertaining to the entire controversy out of which the disputed expenses arose," have been noted as factors considered critical in attempting to determine the line of demarcation. *Estate of Morgan v. Commissioner*, 332 F.2d 144, 150–151 (5th Cir.1964). However, it is clear that "litigation costs incurred in the acquisition or disposition of a capital asset are capital expenditures," while costs that were incurred to "preserve the value of a capital asset" are ordinary business expenses. *See King*, 162 F.Supp.2d at 753–754. Even so, the inquiry into the origin of a claim does not focus strictly on the label given to the action, as the "substance" of an action, more so than the "form" of the action, is critical in determining the origin of the action. *See Clark Oil & Refining Corp. v. U.S.*, 473 F.2d 1217, 1220 (7th Cir.1973).

 "When there are multiple claims and origins, the individual counts or claims may be separated and analyzed . . ." and the corresponding costs so apportioned. *McKeague*, 12 Cl.Ct. at 675. When it is possible to differentiate between expenses as deductible and nondeductible, an allocation of the expenses is appropriate such that some expenses may be deducted as ordinary business expenses under § 162(a) while others must be capitalized under § 263. *See Boagni*, 59 T.C.

at 714; *see also Entwicklungs und Finanzierungs A. G. v. CIR*, 68 T.C. 749, 766, 1977 WL 3611 (U.S. Tax Ct. 1977). Specifically, "legal expenditures should be allocated according to the approximate proportion of the lawyer's efforts attributable to the pursuit of each claim." *Dye*, 121 F.3d at 1410. It may be difficult to determine the apportionment of expenses and, therefore, it is helpful to consider "the records of the litigation, the files of the attorney's, the testimony of witnesses who know the facts, and opinion testimony" when apportioning expenses. *Morgan*, 332 F.2d at 151. However, if possible the parties may reach a "more practical" solution on their own, even if the apportionment derived by the parties is "less scientific" than the one that would have been reached by the court. *Id.* at 151. In an effort to determine which expenses incurred by Plaintiffs were deductible, and thus able to be apportioned if necessary, the Court now turns to each of the four actions at issue.

### A. Charles Warnell Action

 Brought within the same year as Plaintiffs attempted reverse stock split, this action included count one, which requested that no shareholders meeting to consider the stock split be held; counts two, three and four requesting damages; and count five, which sought punitive and other damages was later added by amendment. While the action brought by this group of Warnell plaintiffs sought monetary damages, the damages appear to stem from the attempted, but unsuccessful, reverse stock split. Thus, a reasonable juror could find that the Charles Warnell action had its origin in the attempted reverse stock split. *See King*, 162 F.Supp.2d at 754 (referencing *Brown v. U.S.*, 526 F.2d 135 (6th Cir.1975), where a taxpayer's derivative action was found to have had its origin in an attempt to determine the value of stock such that the valuation action was part of a capital transaction to sell the stock, and reasoning that a juror in the *King* case could find that the action had been brought by plaintiff King in an effort to determine his own stock interest). Charles Warnell brought suit immediately after the attempted reverse stock split, and while proximity in time is not determinative, under such circumstances, it could be inferred that the heart of this action was an attempt to either acquire or terminate ownership interests in the Bank.

### B. Danny Warnell Action

 Admittedly unhappy with the attempted reverse stock split, the proposed name change, the failure to pay dividends and an overall change in Bank management, Danny Warnell filed suit. After filing and dismissing an action in 1991, this action was originally filed in 1993 and amended in 1995, and included count one for failure to pay dividends and count two for mismanagement. Plaintiff sought damages on both counts and pointed to various practices and decisions, including the attempted reverse stock split, as the basis for the alleged mismanagement. After empaneling a jury to hear this case in 1995, the parties reached a settlement agreement which resulted in the payment of legal fees, litigation expenses, some damages and the purchase of stock owned by Danny Warnell for $2725.00 per share. Pointing to the allegation of the attempted reverse stock split as mismanagement, the purchase of the stock, which is admittedly a capital expenditure, and the intentions and litigation strategies of the parties, Defendant asserts the fees, expenses and damages paid by Plaintiff with regard to this suit are capital expenditures. However, the proper inquiry for this, or any, Court to make is into the origin of the claim at issue. *See U.S. v. Gilmore*, 372 U.S. at 47, 83 S.Ct. 623; *see also Woodward*, 397 U.S. at 578, 90 S.Ct. 1302.

From all accounts, dissatisfaction with the management of the Bank was at the heart of this tort action filed by Danny Warnell. *Contra Clark Oil,* 473 F.2d at 1218 (finding that the acquisition of adjoining land was at the heart of the litigation thus it was a capital expenditure, even though the claim was brought as a nuisance action). Danny Warnell sought damages from Bank management. (Edenfield Dep. p. 50–53, tab 35) (Danny Warnell depo. p. 15, tab # 36). In addition, Danny Warnell admittedly did not intend to relinquish control or ownership of his shares of stock in the Bank. (Edenfield depo. p. 21, 42, tab # 35) (Danny Warnell depo. p. 16, tab # 36). Thus, the origin of the claim of Danny Warnell appears clearly grounded in tort, even though one of the torts alleged to have occurred was in connection with a capital transaction, the attempted reverse stock split. The origin of the claim is in tort, even though, in defending this action Plaintiffs in the case at hand, were forced to re-hash the details of another suit, the Charles Warnell action, an earlier action which may have its origin in a capital expense. *See Morgan,* 332 F.2d at 150 (noting that the expenses defendants incurred when involved with a second suit were deductible as ordinary income, even though the second suit was a mere re-hash of an earlier suit that was not allowed as an ordinary expense deduction).

The basis of the Danny Warnell action is Bank mismanagement. Other courts have considered similar allegations of mismanagement when faced with determining whether litigation expenses were deductible as ordinary business expenses, and reached the conclusion that the litigation was a deductible expense. In *McKeague,* the court applied the origin of the claim test to a suit resulting after a failed buyout attempt that had originated from a bitter dispute between shareholders in a close corporation. Determining that dividends were ordinary income, a suit over the payment of dividends was deemed an ordinary expense. Furthermore, the court found the mismanagement claims to also be ordinary expenses as a suit for mismanagement is a suit to protect existing income or to continue an existing business. *See McKeague,* 12 Cl.Ct. at 676–677. Furthermore, it is obvious that Danny Warnell alleged Bank mismanagement, and that preventing mismanagement would protect the value of existing income. This effort to protect existing income focuses the Court's attention on *Stevens v. CIR,* No. 18012–97, 1999 WL 566836 (U.S.Tax Court Aug. 4, 1999) (quoting *Estate of Kincald v. Commissioner,* T.C. Memo.1986–543), where the findings of fact stated, "[t]he belief that the trust in *Estate of Kincald* was being mismanaged to the detriment of the taxpayer's interest as income beneficiary was the origin of the claims made in the lawsuit, and we so found, holding that the expenses were deductible..." Clearly, the alleged mismanagement of the Bank would have been a detriment to Danny Warnell's income, thus, the origin of his claim is founded in an effort to protect his investment.

Additionally, the action brought by Danny Warnell was not the continuation of any other transaction, the action was brought merely to recover damages for alleged mismanagement. As such, no other transaction hinged on the outcome or completion of this litigation. Thus, this action falls outside the class of actions considered to be capital expenditures in *Meade.* In *Meade,* the court reasoned that those actions upon which another transaction hinged or those actions that were required to be completed before another transaction could be consummated were capital in nature, as those actions were merely one part of a capital process. *Meade,* 489 F.2d at 167. No other action is contingent upon the outcome of the Danny Warnell action

and as such it is not a part of a capital process.

Finally, the Court feels compelled to distinguish the Danny Warnell action from that of the plaintiffs in *Brown*, which is discussed above as it is cited in *King*. In *Brown*, the Sixth Circuit determined that the taxpayer brought the action to determine the value of her stock as her brother had earlier offered to buy the stock. This finding stemmed from the fact that the taxpayer first retained legal counsel to advise her on whether or not to accept her brother's purchase offer. The taxpayer's counsel advised that the purchase offer should include a recognition of the taxpayer's interest in a related company and the ensuing litigation resulted when the brother refused to divulge information as to the value of the related company. *Brown,* 526 F.2d at 138–139. Danny Warnell brought suit for the payment of dividends and mismanagement. While there had been an earlier attempted reverse stock split, Danny Warnell was not considering that or any other offer to purchase his shares in the Bank and was seeking only to protect his interest in the Bank, not to determine the value of his stock ownership for a contemplated sale. Thus, the finding that the litigation in *Brown* was a capital expense is not controlling in the instant case because, unlike in *Brown*, the origin of the Danny Warnell claim did not stem from an earlier capital transaction.

### C. Strickland Action

Both parties combine the Strickland action with the Danny Warnell action, as they are identical involving the same facts, issues, claims and resolution. Therefore, the Court will do the same. Accordingly, the Court finds that the origin of this claim lies in tort and is a deductible expense.

### D. Dorothy Warnell Action

■ This action is different from the proceeding three, in that, Plaintiffs admit that at least a portion of these expenses are nondeductible. After the buyout settlement with the Charles Warnell, Danny Warnell and the Strickland actions, Plaintiffs purchased all the outstanding shares held by those parties. In so doing, Dorothy Warnell asserted that shares she actually owned were mistakenly identified as being owned by Charles Warnell, and thereby purchased by Plaintiffs as a part of the settlement agreement. Ms. Warnell sued Plaintiffs for damages equal to the value of stock or for the return of the stock. Clearly, the origin of this claim lies in a dispute over title to property, as Plaintiffs were defending a challenge to the ownership of recently purchased shares of stock and, therefore, these are nondeductible expenses. *See Boagni,* 1973 WL 2589, 59 T.C. at 713–714 (stating, "expenses paid or incurred in defending or perfecting title to property (or) in recovering property constitute a part of the cost of the property and are not deductible expenses").

### IV. CONCLUSION

As the origin of the claim test is controlling, the Court considered the origin of each claim separately in determining whether or not the litigation expense associated with each claim was deductible as an ordinary business expense. For the foregoing reasons, Plaintiff's Motion for Summary Judgement is **DENIED** as to the Charles Warnell action because a reasonable juror might conclude the claim had its origin in the attempted reverse stock split. Plaintiff's motion is also **DENIED** as to the Dorothy Warnell action as this action is clearly an action to defend or perfect title to property. Finally, Plaintiff's Motion for Summary Judgement is **GRANTED** with regard to the Danny Warnell and the Strickland actions as these claims have their origin in the payment of dividends, which is ordinary income, and in Bank

management, which is an attempt to protect existing business or income.